## McClintock v. McClintock.

(Decided March 7, 1912.)

### Appeal from Fayette Circuit Court.

1. Residence—What Constitutes.—One may have a residence in a boarding house as well as in a rented building or in property owned outright.

2. Husband and Wife.—Divorce Proceedings—Evidence of Home Life.—Under our rule of evidence allowing neither husband or wife to testify in divorce proceedings it frequently happens that no accurate insight into their home life can be obtained and we are therefore furnished but fragmentary evidence of their marital woes.

3. Absence of Companionship.—The evidence in this case shows that the husband instead of treating his wife like a companion seemed to look upon her as a tool or piece of machinery brought into the house to add to his pleasure.

4. Dictatorial Conduct of Husband.—The evidence shows that he declined to furnish her a means of conveyance in order that she might return the calls of her lady acquaintances who lived too far away for her to walk conveniently, although it is shown that he was worth from $20,000.00 to $40,000.00 and a business that produced annually from $2,000.00 to $3,000.00 besides. He was domineering and dictatorial in his treatment of her and was oblivious to the fact that the one thing needed by her was some evidence that he loved and cared for her.

5. Same—Separate Maintenance.—In this action the wife is not seeking a divorce but is seeking a separate maintenance which the chancellor is authorized by the statute to grant, where from the evidence it appears that the best interests of the parties require it even though a cause for absolute divorce may not have been made out.

6. Support of Wife and Child—Allowance.—The chancellor should have allowed her at least $100.00 a month for the support of herself and infant child, and this sum may be increased as the child grows older and its wants and necessities require it to be paid upon the first of every month.

GEORGE C. WEBB, TALBOTT & WHITLEY and MAURY KEMPER for appellant.

ALLEN & DUNCAN and DENIS DUNDON for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Reversing.

Appellant and appellee were married in July, 1906, and separated in August, 1909. Shortly after the separation she instituted a suit for divorce a mesna et thoro, on the statutory grounds of cruel and inhuman treatment. The answer is a traverse. Much proof was taken, covering practically all of the married life of the litigants, and upon final submission the chancellor dismissed the petition and denied plaintiff any relief whatever. She appeals.

In the lower court the point was made that the Fayette Circuit Court had no jurisdiction to try and determine the case. The evidence shows that when appellant left her husband's home in Paris, Bourbon County, she went out to the home of a relative near that city, and a few days later went to Lexington to the home of another relative. Shortly thereafter she brought this suit in Fayette County. She had no home of her own to go to and had to decide where she wanted to live. It was purely a matter of election on her part, and, as said by this court in Gooding v. Gooding, 19 Rep., 967, "the intention of the party and fact of location at any point make the residence." It is conceded that, had she rented premises in Lexington and gone to housekeeping, under the authority of the Gooding case, her residence would have been established in Fayette County; but, that, because she stopped with a relative, a different rule should apply. This reasoning is not sound. One may have a residence in a boarding house as well as in a rented building or property owned outright. The question is not how she lived, but had she determined to make Lexington her home. In her petition she says that she had, and the best evidence of such determination on her part we find in her going there and declaring when she filed

her suit that it was her home. The trial court correctly so held.

While denying the plaintiff any relief whatever, the chancellor in his judgment awarded to her the custody of their eighteen months old child, and directed that her husband should pay monthly for the support of herself and her child, during this litigation, $62.50 per month; but made no provision for the support of either the appellant or the child after the termination of this litigation. The judgment giving to the wife the custody of the child was eminently proper, and the provision made for its father to see it at stated intervals and to have the custody of it on certain days of the week was fair and reasonable to both parties. The child is still in the custody of the court, and although no order has been made by the court for its support by its father after the termination of this litigation, the chancellor would have ample power to make such further order from time to time as its needs and condition required.

The real question raised upon this appeal was the correctness of the chancellor's ruling in dismissing plaintiff's petition. Under our rule of evidence, allowing neither husband nor wife to testify in divorce proceedings, it frequently happens that no accurate insight into their home life can be obtained, and we are furnished but fragmentary or broken bits of evidence of their marital woes. This record presents such a case. Appellee at the date of their marriage was past fifty years of age; appellant was about twenty-five. His habits in life were fixed; hers were in the formative period. He was a man of the world, of large business experience; she was raised in the country, and was apparently younger in experience than in years. He was a shrewd, cool, calculating, methodical business man; she, an unsophisticated country girl. She was of a very affectionate disposition; he not at all demonstrative. Shortly after their marriage she was taken sick of a trouble peculiar to women, and it became necessary for her to submit to a surgical operation a few months after their marriage. She remained at the hospital in Lexington for some weeks and until she was apparently relieved of the trouble. About a year after her return home a girl baby was born to them. The record furnishes but little evidence of their home life during the interval between her return from the hospital and the

birth of their child. Some difference arose between them as to the proper method of raising the child. Appellee did not think that his wife's milk was sufficiently nourishing; she insisted that it was, and wanted to nurse her baby, and was opposed to raising it on a bottle. After some considerable trouble over the matter she was permitted to have her way. But this difference was evidently not regarded by her as of a serious nature, because in the spring of 1908, when she went on a visit to some of her people in St. Paul, Minnesota, she wrote frequent leters to her husband, and from the tone thereof it is apparent that she entertained none other than the kindliest of feelings towards him. All of these letters are filled with terms of endearment and manifest beyond question that she was entertaining no feeling of resentment toward her husband for his trying to make her ween her baby or raise it by hand.

She was a member of the Christian Church before they were married, and it appears that, during a revival in the Christian Church in Paris in the winter of 1908 and 1909, at the earnest solicitation of John McClintock, a brother of appellee, she put her letter in that church, and, while she made no secret at her home of her intention so to do, and discussed the matter with her brother-in-law, Mr. McClintock, in the presence of her husband, it is reasonably apparent that her husband did not know she had done so, and did not discover this fact until the latter part of February or early in March, 1909. His attention was drawn sharply to this fact by a request on the part of his wife that he pay her dues to the church, then amounting to some $12 or $13. He became very much offended on account of his wife's having put her letter in the church without notifying him, and worked himself up into such a rage over it that it was necessary to send for and have a doctor minister to him in order to quiet his nerves. At that time, and while he was in what the witnesses term a "tantrum," he notified his wife that there would have to be a separation. Insisting that she had done no wrong in transferring her membership from the country church to the city church of the same faith, and that he was wholly unjustified in treating her in the way and manner in which he was on account of it, she nevertheless pleaded with him not to carry out his intention of separating from her, and urged that, even though he had no regard for her, he should not do so on account

of their child.  He left the home on that night and did not return for two days.  According to the testimony of the witnesses, when he did return he still said that a separation would be necessary and insisted that it should take place, and wanted to arrange to have one of his wife's relatives make proper provision of his estate among himself, his wife and their child.

He was a member of the First Presbyterian Church which, at that time, however, was not holding services regularly.  From that time until their separation, it is apparent that the home life of Mrs. McClintock was very unhappy.  Mr. McClintock was engaged in looking after his business affairs.  He would eat his breakfast in the morning, go down town, returning at noon for his lunch, when he would again leave and not return until time for dinner in the evening; and after dinner it was his custom to go back down town and remain there until nine or ten o'clock.  His wife spent practically all of her time at home with her baby.  She saw little of her husband; he paid but little attention to her.  The servant testifies that many times she found her in tears, and that this was particularly true during the two latter months of her stay at her husband's home, when she cried most every day.

The latter part of June, or early in July, their baby was taken sick with summer complaint and whooping cough.  Dr. Vansant was called upon to treat her.  Mrs. McClintock did not think that the child was improving under this treatment and became dissatisfied with it and wanted another doctor.  Her mother had a prescription which she had used successfully in the treatment of her own family and others for whooping cough, and she she wanted it filled and the child given some of that medicine.  It thereupon resulted that, on account of the anxiety of each parent for the health and welfare of their child, another quarrel was brought on, and again he notified his wife that they would have to separate; that, while he had sought to avoid it, he found it to be necessary.  At that time she was in a highly nervous condition, due to the return of the old trouble for which she had been treated at the hospital prior to the birth of her child and the worry incident to its present sickness, and, following this quarrel with her husband and the announcement on his part that there would have to be a separation, she was taken down sick and remained

in bed under the care of a physician and a nurse for some
eight or ten days. During this illness her husband paid
no attention to her whatever, did not go to her room or
manifest any interest in her further than to inquire of
the nurse how she was. When she had practically re-
covered from this illness she notified her brother, living
in the northwest, of the trouble she was having with her
husband, and he came on to render such assistance as he
could. He called upon her husband for an explanation
of his conduct, and asked him why he had notified his
wife that there would have to be a separation. Appel-
lee at first denied having made the statement, but when
confronted by his wife with the charge that he had, he
admitted that he had lost control of his temper and did
not know what he did say. He made no effort whatever
to effect a reconciliation with his wife and offered no ex-
planation, further than that he had lost his temper, for
the way and manner in which he had treated her.
Shortly thereafter she took her baby and left his home,
and thus the separation, which he had declared in Feb-
ruary or March was necessary, was brought about.

He insists that the whole trouble was due to the pres-
ence in his home of his wife's mother a good part of the
time, and her sister on two or three occasions, and per-
haps a dissipated brother, who visited them on one occa-
sion for a few weeks. There is no foundation in fact
for this charge. The record shows that there was never
the slightest disagreement or unpleasantness between
Mr. McClintock and either Mrs. Rogers, his mother-in-
law, or her sister, Miss Rogers. The relation between
them at all times was cordial. It is in proof that he in-
sisted on Mrs. Rogers making her home with them, and
Miss Rogers was there for the purpose of assisting his
wife with sewing for his wife and her baby. Nothing oc-
curred to mar the pleasantness of the family relations
during the period that they were visited by his brother-
in-law, although it is shown that during his stay there
he was frequently intoxicated and Mr. McClintock
would have to go out and bring him in, much to their
mortification, though he did not complain to the family
or any one else, so far as the record shows, or blame
his wife on account of the trouble they were having or
humiliation they were being put to because of her dissi-
pated brother. The whole trouble, as appears from this
record, is that Mr. McClintock, prior to his marriage,

had become so fixed in his ways and habits of living and
had been so accustomed to doing as he pleased, that he
found it difficult to accommodate himself to the changed
condition, and he was wholly lacking in appreciation of
the duties which the marriage state imposed upon him.
Instead of treating his wife like a helpmate or companion,
he seemed to look upon her as a tool or piece of ma-
chinery brought into the house to add to his further
pleasure.   Many illustrations are given in the record
evidencing this lack of appreciation of the duties he
owed to his wife.   Instead of trying to please her, he
was given to saying things and doing things in the pres-
ence of visitors that were calculated to greatly annoy
and embarrass her.   When she traded with merchants
who were not customers of his in his business he threat-
ened to advertise her if she did not quit.   When she
used the long distance telephone in an emergency call to
talk to a lady friend in Lexington, who had been very
nice to her, he notified her that if she did not stop it he
would take out the telephone.   And just a short time
before the separation, when she was sitting on their
porch, in the presence of two neighbor women, he asked
her if she had given their child the medicine as directed.
She stated that she had not, because the child had been
asleep most of the time; and in a very unkind, fault-
finding tone, he said: "About as I expected;" and then
stated that he would have to get a trained nurse to attend
to the wants of his child.

Although finding fault with her because she had
transferred her membership to her own church without
consulting him, there is not a line of evidence that dur-
ing the three years of their married life he ever ac-
companied her to church or offered to accompany her to
church, either to his or to her church.   His lady ac-
quaintances called upon them after their marriage, and
appellant wished to return the calls of some of them who
lived too far away for her to walk conveniently.   It is
in proof that he declined to furnish her a means of con-
veyance in order that she might return these calls; nor
was he willing to share even a part of this expense, al-
though it is shown that he is worth from $20,000 to $40,-
000 and had a good business that produced annually
from $2,000 to $3,000 besides.   Frequently she wanted
money, and his response to her would be that she did not
have sense enough to spend money intelligently, and
when he did give her any he did it apparently begrudg-

ingly. During the whole and particularly the latter part of their married life, according to the record, he was dogmatic, domineering and dictatorial in his treatment to her, and while he furnished her a good home, suitable provisions, necessary clothing, and the service of servants when required, he seemed utterly oblivious of the fact that the one thing needed by his wife to make her supremely happy was withheld from her. She wanted some manifestation, some evidence, that he loved and cared for her. She wanted to feel that she was more to him than the dogs of his kennel, or his moneys in the bank, or his interests in the many businesses conducted by him. These essentials to her happiness were wholly lacking, and it is not surprising that, when for the second time he told her there would have to be a separation, she acceded to his demands, accepted the inevitable, and left him.

We have carefully searched the record and find no evidence of any wrong-doing whatever upon her part. When her baby was to be born she went to an infirmary, away from him, alone, to pass through that trying ordeal. She returned to him as soon as she was able to do so, and from that time on she was a dutiful, loving wife. She wanted to raise her baby herself, as every true mother wants to do. She was opposed to raising it by hand as he wanted her to do, and surely this desire on her part furnished to her husband no just ground of complaint. The transfer of her letter from the country church to the city church should have been pleasing to him rather than otherwise, for his brother was a pillar in that church, and he seems fond of his brother. Since he had not been accompanying his wife to church, either to his own or to hers, the reason he gives for wanting to know when she was going to put her letter in the church is not satisfactory. And since no complaint was made until she was called upon to pay her church dues, we are forcibly impressed with the idea that he opposed the transfer of membership in order to avoid the expense. But whatever his reasons for objecting may have been, the conduct of his wife furnished him no ground of complaint.

And lastly, coming down to the trouble that culminated in her leaving home, she did nothing which any fond and considerate mother might not do. The medicine which Dr. Vansant was giving was doing the child no

good. She was with it day and night, watching over it, and knew much better than her husband the effect the medicine was having upon it, and she wanted a change, and, instead of finding fault with her for wanting a change, he should have joined her in welcoming any suggestion that would look toward the improvement of the child. Instead, however, of sympathizing with his wife in her distress over its sickness, we find him flying into a rage and declaring that nothing short of a separation would satisfy him.

The question that presents itself is, to what extent must a wife submit to indignities of this character? How far shall her feelings be outraged because of the ungovernable, uncontrollable temper of her husband? Will the law afford her no relief, or must she silently submit to this character of treatment until he actually physically ejects her from his home? She is not seeking an absolute divorce, but merely a separate maintenance. Section 2121, of the Kentucky Statutes, provides, in part, that:

"Judgment for separation or divorce from bed and board may also be rendered for any of the causes which allow divorce, or for such other cause as the court in its discretion may deem sufficient."

In Freeman v. Freeman, 11 Rep., 824, and again in Zumbiel v. Zumbiel, 113 Ky., 841, this statute was construed. In the former case, in speaking of the power of the court, it is said:

"It is plain, however, from the language of the statute, that he is not restricted to the statutory grounds which authorize an absolute divorce. Before the adoption of our statutes the law gave to the wife, upon sufficient grounds, the right to a decree of separation and alimony, although no legal cause for divorce existed."

And in the latter case, the court said:

"It is to be observed that the circuit court is not restricted to the statutory causes for granting divorces a vinculo matrimonii in granting divorce from bed and board. He may, in his discretion, grant the latter separation for a less cause than those enumerated in the statute. (Section 2117.) But, as said in Shrock v. Shrock, 4 Bush, 684: 'Of course, the discretion thus conferred is not to be understood as arbitrary or unlimited, but a sound legal discretion, and only to be exercised for such causes as may be deemed sufficient, when con-

sidered with a just and reasonable regard to the legal rights and obligations of both parties.' ''

In Reinhard v. Reinhard, 96 Wis., 555, 65 Am. St., 66, the court had under consideration the right of a wife to a divorce from her husband on the ground of cruel and inhuman treatment. It was shown in that case that they lived in the same house, ate at the same table the food prepared by her, and that frequently he failed to speak to her except in an unkind manner for as much as three months at a time. The court held that the wife was entitled to the decree and, in the course of the opinion, said:

''Marriage implies companionship, and is supposed to be based upon mutual regard and affection. For a husband and wife to live and sleep in the same house, and eat at the same table food prepared by the wife, without the husband speaking to the wife, except in anger, for a period of three months at a time, must have been, at least, very disagreeable, if not unbearable. That such was the fact does not seem to be very seriously disputed. It certainly evinced abnormal affections, persistent wantonness, and deliberate perversity. The effect of such conduct upon a nervous, sensitive woman can better be imagined than described, and may have seriously impaired the plaintiff's health, as found by the court. This court has repeatedly held that personal violence, whether actual or threatened, or even gross and abusive language, is not absolutely essential to constitute cruel and inhuman treatment.''

In Robinson v. Robinson, 66 N. H., 600, 49 Am. St., 632, a divorce was sought upon the ground of cruelty and ''treatment endangering reason or injuring health,'' as authorized by the statute. It appears that in that case the parties were married and lived happily together for two years, when the wife became interested in Christian Science, attended lectures, took a course of instruction, and subsequently received the degree of Doctor of Christian Science. She began and continued to practice as such doctor. Her husband did not believe in the doctrine, and had no sympathy with his wife in her advocacy or of practice under it. He did not object to her believing in it, but was opposed to her practicing it, because it exposed him to ridicule and injured his business as a druggist; and he requested his wife to give it up. She refused to do so and a separation re-

sulted. Thereafter he sought to bring about a reconcil-
iation and induce his wife to return to him, making as a
basis of such proposition, however, that she give up the
practice of Christian Science. This she declined to do.
The court found that the only ground for difference be-
tween them rested in her determination to practice this
doctrine, in which she was a firm believer. In disposing
of the question, the court said:

"Whether one party has been so treated by the other
as seriously to injure health or endanger reason is a
pure question of fact. It can not be declared as matter
of law that any particuler treatment may not have that
effect. The gist of these causes of divorce is the injury
to health and the danger to reason. Conduct which to
a serious extent produces either, though not intended to
have such a result * * * is a cause of divorce."

We have no such statute as that upon which the
judgment in the case quoted from was rested. But the
provision of the Kentucky Statutes is even broader, in
that it authorizes the chancellor, in the exercise of his
discretion, to grant to the wife a separate maintenance
where, from the evidence, it appears that the best inter-
ests of the parties require it, even though a cause for
absolute divorce may not have been made out.

In Gardner v. Gardner, 104 Tenn., 410, 78 Am. St.,
924, the court, in considering the plaintiff's rights under
a statute very similar to ours, said:

"It is now well settled by this court that cruel and
inhuman treatment within the meaning of the statute is
not confined to acts of personal violence, but includes
such treatment as endangers the wife's health and ren-
ders cohabitation intolerable."

The ground upon which the divorce was sought there
was excessive intercourse.

In Cole v. Cole, 23 Ia., 433, a divorce was sought on
the ground of cruel and inhuman treatment. In the
course of the opinion the court said:

"If the conduct is marked with cruelty, if it is cruel
and unfeeling, indicating an absence of that kindness and
tenderness that belongs to a human being, it is sufficient,
if it endangers life."

In that State the statute authorized a divorce for
cruel and inhuman treatment endangering life, and in
the case under consideration it was insisted that any
treatment which merely showed an injury to health

would not authorize a divorce under this statute. But the court, in further considering the question, said:

"It is true that not every fancied or real wrong which may for a while render unpleasant the complainant's life or subject her to momentary pain or temporary illness would amount to legal cruelty. But if the act involves, that is, if it is connected by natural consequences or effects with the health, not for a moment, not temporarily, but to its actual and legal prejudice, it amounts to legal cruelty."

In Reed v. Reed, 4 Nev., 395, the court used this language:

"There may be extreme cruelty without the slightest violence—the happiness of a life may be destroyed by a course of conduct which would afford no ground for apprehending bodily harm or injury. * * * In our judgment it is the effect and probable consequence of the misconduct complained of which should control the actions of the courts more than anything else. Hence, if it appear probable that the life of one of the parties is rendered miserable by any character of misconduct on the part of the other, although no personal violence be apprehended, or if there be reason to apprehend bodily harm if the marriage relations be continued, the separation should be decreed."

In Glass v. Wynn, Extr., 76 Ga., 319, in defining legal cruelty, the court uses this language:

"Mental anguish, wounded feelings, constantly aggravated by repeated insults and neglect, are as bad as actual bruises of the person; and that which produces the one is not more cruel than that which causes the other."

In Myrick, v. Myrick, 67 Ga., 771, after reviewing at length the facts of the various cases under which a divorce was authorized on the ground of cruel treatment, the court says:

"Thus, if the husband, by neglect and indifference, or by studied acts of insult and wrong practiced upon the wife, that have an open and manifest tendency to degrade the wife in her social position, to render her life miserable and unhappy, to make her life intolerable, and her intercourse with her husband a source of pain and suffering rather than of pleasure and happiness, although no personal violence is done or threatened, in all such cases a divorce should be granted."

In Rosenfeld v. Rosenfeld, 21 Ia., 16, the court said:

"The law does not require that acts of cruelty authorizing a divorce should show that it is absolutely impossible for the parties to live together as husband and wife. Extreme cruelty, under our statute, may consist of words and of personal treatment and conduct short of acts of personal or physical violence."

And in Marks v. Marks, 62 Minn., 212, it is held that:

"A systematic course of ill-treatment, consisting of continual scolding and fault-finding, using unkind language, studied contempt, and many other petty acts of a malicious nature, may, when sufficiently long continued, and when producing sufficiently serious results, constitute cruel and inhuman treatment."

Upon the current weight of authority, it may be said that any conduct on the part of the husband or wife which is calculated to seriously impair the health or permanently destroy the happiness of the other is sufficient ground to justify an absolute divorce; and that a divorce from bed and board will be granted upon grounds insufficient to support a decree of absolute divorce. In either case the object of the court is not to punish the offender, but to protect the unfortunate, and while a decree should never be granted upon slight differences, which are likely to arise from time to time in the best of well regulated families, it should not be denied when it is made clearly to appear that the conduct of the offending party is such that, to continue the marital relation would either permanently destroy the happiness or ruin the health of the other.

In the case at bar it can not be doubted that the declaration on the part of the husband in the early spring, that there would have to be a separation, had a very serious and injurious effect upon the life and health of his wife, for, according to the testimony of his servant, who was a most unwilling witness upon this point, appellant spent much of her time in tears thereafter. And while she bore her sorrow in silence and with becoming fortitude, this cruel, inexcusable and uncalled for declaration on the part of her husband undoubtedly caused her great mental distress and suffering, and when it was repeated in August it so unnerved, unstrung and affected her that she became very sick and was for some time under the care of a physician.

If appellant had done anything in any way to justify

this treatment on the part of her husband, the record fails to disclose it. In all of the testimony that he has produced there is not even an intimation that she was not at all times a kind, affectionate, loving and dutiful wife. Physically weak and nervous, this conduct on his part had a very injurious effect upon her health. She did not want a separation. She did everything that a woman could reasonably be expected to do to avoid it, and only finally yielded to this expressed desire of her husband when she was satisfied that it could not be avoided. To deny her any relief under such circumstances would be both inequitable and unjust. If the conduct of her husband has made life so intolerable in his home that she can no longer remain there without endangering her health and destroying permanently her peace and happiness, he should be required to support her elsewhere, and the chancellor, in the exercise of his discretion, should have so directed.

The evidence shows that appellee is worth from $20,000 to $40,000, and has an income of from $2,000 to $3,000. His wife has nothing. The court properly awarded her the custody of their child. It must be supported. The provision which the chancellor made is not sufficient, taking into consideration his financial condition and standing in life. He should have allowed her at least $100 a month for the support of herself and child; and this sum may be increased as the child grows older and its wants and necessities for clothing, schooling, etc., require the expenditure of additional sums, or it may be reduced if the circumstances of the parties require it. The judgment is reversed and cause remanded, with instructions to the chancellor to enter a judgment granting to appellant the relief sought, to-wit, a divorce from bed and board and a separate maintenance, which he will fix in his order for the present at $100 per month, to be paid upon the first of each and every month.