## Riggins v. Riggins.

(Decided March 18, 1921.)

### Appeal from Logan Circuit Court.

1.   Divorce—Cruelty—What Amounts to.—Occasional quarrels about trivial things, or occasional outbursts of temper accompanied by the use of bad language or other rudeness, or thoughtlessness at times about the rights and privileges of the wife, do not constitute upon the part of the husband such habitual misconduct as amounts to cruel and inhuman treatment within the meaning of our statute; the conduct must be of that studied, persistent and habitual character which if persisted in will eventually amount to cruel and inhuman treatment, even in the absence of any physical violence or attempted violence.

2.   Divorce—Cruelty.—Evidence examined and held not to sustain the plaintiff's charge of cruel and inhuman treatment.

3.   Divorce—Maintenance.—Where the wife was not justified in leaving her husband separate maintenance will not be given her.

I. G. MASON and SIMS, RODES & SIMS for appellant.

R. W. DAVIS, S. R. CREWDSON, TRIMBLE & BELL and SELDEN Y. TRIMBLE for appellee.

Opinion of the Court by Turner, Commissioner—
Affirming on original and cross appeal.

Appellant and appellee were married on the 25th of November, 1917, and immediately thereafter went to live at the home of appellee's father, where the latter and his wife lived. They continued to live at that home for about eighteen or twenty months, when they moved to a house on the father's farm about 150 yards away. On the 9th of September, 1918, a son was born to them, and on the 22nd of December, 1919, appellant took her child and left his home and went to that of her father, where she and the child have since been. Two days thereafter she filed this action for divorce, charging cruel and inhuman treatment.

The defendant answered putting in issue this charge, and made his answer a counterclam only for the purpose of obtaining the custody of the child, alleging as ground therefor that he was very much attached to the child, but that the plaintiff had no love for the child and no affection for him and did not want him, and that she mistreated him, and that by reason of her high and ungovernable temper and want of affection for him she was not a proper person to retain custody of him.

These affirmative allegations in the counterclaim were denied by reply.

At the time of the marriage each of the parties was 28 years of age. They had been reared in the same vicinity only a few miles apart, but while they had gone to school together as children, they had never until a few months before their marriage been thrown together or associated with each other. On the contrary, it is shown by clear inference throughout the record that they had moved in different circles, she being the daughter of a family which took pride in its ancestry and apparently asserted some claim to superiority in the community, while he was the son of parents in the humbler walks of life, who had toiled and worked throughout their lives to accumulate property, and had taught him along the same lines. She, in accordance with her rearing, naturally loved the society of her friends and wanted to go to places of amusement, while he, following in the footsteps of his plodding parents, knew nothing but work and thought of little but accumulation.

With these differences in training and temperament they went, unfortunately, to live with his mother and father, and while for the first months it appears they got along nicely and without friction, they afterwards at times had what appears to have been only trivial differences.

The chancellor below, after a full consideration of all the evidence, dismissed the plaintiff's petition, but entered no order whatever on the counterclaim, and thereby in effect dismissed it, leaving the custody of the child with appellant. From that judgment the plaintiff appeals, and the defendant prosecutes a cross appeal because the lower court refused him the custody of the child.

The ground of divorce given by our statute (sec. 2117) to the wife when not in like fault is ''habitually behaving toward her by the husband, for not less than six months, in such cruel and inhuman manner as to indicate a settled aversion to her, or to destroy permanently her peace or happiness.''

So that primarily the questions are: first, does the evidence sustain the charge of the plaintiff? Second, has the defendant established the allegations of his counterclaim so as to justify the removal of the custody of the infant from the mother to the father?

I. In discussing the evidence upon the main issue, we will take up some of the most prominent incidents referred to in the plaintiff's own evidence, and at the same time refer to the defendant's evidence as to each of them.

The plaintiff's own evidence is that she and her husband lived happily together for the first four months, and that the first time they had any real cross words was one Sunday morning when she asked him to take her to her father's home, and he told her to shut her mouth, that he would take her when he got ready. She stated this occurred about eight o'clock in the morning and that he did not take her for several hours afterwards but finally did take her on that day.

As to this occurrence the defendant denies that he told her to shut her mouth on that or any other occasion, and says he had never used such language to her in his life; that he regularly took her to her father's every other Sunday and sometimes oftener, and that he had no recollection of ever offering objection to so doing. And

they both say that it was their custom to spend every other Sunday there.

She also says that on one occasion when there was some controversy or misunderstanding between her and appellee's mother as to the picking of some strawberries, appellee's mother called her a liar in his presence and that he never said a word.

Appellee states that he never heard his mother call his wife or any one else a liar, or use any such language; that his mother's feelings were hurt because his wife had not helped her, but there was nothing said about it, and this statement is corroborated by the appellee's mother.

Appellant further says that in January after the birth of the baby she and the child both had the "flu," and she was sick on Monday morning and asked for a doctor (but does not say whom she asked) and that the doctor was not called until Wednesday night, and that she was put to bed on a single cot in his mother's room and the baby slept with the grandmother. She says in connection with this incident that this was because they did not want to burn two fires, and that she never had a fire in her room in the daytime during the winter.

The defendant testifies that the plaintiff never asked for a doctor and that on Monday his wife had done some washing, and that on Tuesday she had a bad cold, and that on Wednesday the doctor was first sent for to see the baby, and that when he came he told them all they were taking the "flu," and his wife went to bed that night on the narrow bedstead in his mother's room so that she could be near to his mother; and that she had never at any time during their married life asked for a doctor or suggested that she needed one that she did not have one.

It is apparent that she and the baby were placed in his mother's room so that the latter might care for them during their illness.

Appellant further claims that when she went to house-keeping her father had given her a set of furniture, and that when it came crated up she asked her husband to uncrate it, and he directed her to do it herself, and that she did; that they lived in that new place about a week before there were any screens put in, and that then she tacked them in herself, and that she had to hang the screen doors.

As to this incident it is shown that several members of the Riggins family aided in fixnig up and repairing

the house, including the defendant himself, his mother, his brother and his brother's wife; and the defendant says she never asked him to uncrate the furniture but says that she did it in his absence.

She further states that her husband spoke disrespectfully of one of her close woman friends, of her grandfather and of her uncle, but this is denied altogether by the defendant except that he admits that one statement he made about her uncle was based upon information gotten from her.

The most serious charge against the appellee in the appellant's evidence is that one night—the date not fixed or approximated—when they were quarreling he sharpened his razor and laid it on the dresser and took his pistol out and unloaded it and then went out into the night and stayed a while and came back.

This evidence is positively denied by the defendant, and the two are the only witnesses on the subject; but we are impelled to say from the other evidence in the record as to the disposition, nature, character and temperament of the appellee that it goes far toward corroborating his evidence in respect to the latter incident. The evidence shows without contradiction that he is a moral, religious, quiet, even-tempered man; that he never drank, played cards or indulged in other forms of dissipation, and it must be said that the plaintiff's evidence as to this occurrence is out of harmony with what the whole evidence shows to be the life and character of appellee.

Our view of the evidence as to this matter is further corroborated by the appellant herself when she admits in her evidence that at one time after the separation she had agreed to go back and live with him again if he would sell out and go elsewhere and make a new home, but she subsequently refused to carry out this agreement because he said it was necessary for him before doing so to consult the other members of his family with whom he was associated in business.

Relying upon our own view of the evidence, and fortified by the finding of fact by the chancellor below, we find no such state of case as has established such a course of habitual behavior towards appellant by appellee as amounts to cruel and inhuman treatment within the meaning of our statute.

Surely he had no settled aversion to her or he would not have, as shown by her own evidence, begged her several times to return and live with him; surely her peace or happiness was not permanently destroyed or she would not have consented to return and live with him upon certain conditions if these occurrences which are now relied upon were of that serious nature which it is now sought to make them appear.

There is nothing in this record, when the evidence is analyzed, seriously reflecting upon either of these young people, and notwithstanding the difference in temperament and training, they probably would have, if they had been left to themselves during the trying period of adjustment immediately after their marriage, worked out their own salvation and lived happily together, and we see nothing in the record which has up to this time erected an insurmountable barrier to the consummation of that desired end.

Occasional quarrels about trivial things, or even occasional outbursts of temper accompanied with the use of bad language, or other rudeness, or thoughtlessness at times about the rights and privileges of the wife, do not constitute such habitual misconduct as amounts to cruel and inhuman treatment. The most that can be said under the evidence in this case is that the appellee, being absorbed chiefly in his business, was not at times as considerate and thoughtful of his wife's wishes as he might have been. His conduct did not consist of that studied, persistent and habitual misconduct which the law says if persisted in long enough will eventually be treated as cruel and inhuman, even in the absence of any physical violence or attempted violence. Hooe v. Hooe, 122 Ky. 590; Beall v. Beall, 80 Ky. 675; McClintock v. McClintock, 147 Ky. 409; Finley v. Finley, 9 Dana 52.

II. As to the custody of the infant little need be said. The chancellor properly left him with his mother.

There is no convincing evidence in the record that the mother lacks in any degree that love and devotion for her offspring which is so universal with good and moral women. That she may have at times spoken crossly to the child is not impossible, and indeed not out of the ordinary, but that she ever laid her hands on him in anger is not to be believed. It would not only be cruel to the mother but a crime against the infant at his tender age to take him from his mother.

The circuit court will retain this case on its docket and enter an order requiring the defendant to pay to the plaintiff each month $25 for the support and maintenance of the infant, the allowance to begin at such time as the *pendente* allowance now being paid to the mother shall cease; and in addition will enter such order as will permit the father to visit and see the infant at least once a week. The appellee will pay all the costs in this court, including a reasonable fee for her attorneys to be fixed by the circuit court.

It is further contended for appellant that even though the facts in evidence should be held to be insufficient to warrant the granting of a divorce, yet where there has been such cruelty upon the part of the husband as to justify her leaving him, separate maintenance should be given to her, and the case of Gans v. Gans, 157 Ky. 775, is cited in support of that contention.

The rule contended for, as will be shown by an inspection of the case cited, is applied only where the wife is justified in leaving her husband, and we have seen from the evidence in this case, and from the conclusions of the lower court, that appellant had no such justification, and therefore the rule has no application.

The judgment is affirmed on both the original and the cross appeals.