## COLEMAN v. COLEMAN.

Court of Appeals of Kentucky.

June 23, 1954.

Phillips & Dean, Harrodsburg, Smith, Reed & Leary, Frankfort, for appellant.

Draffen & Wickliffe, Harrodsburg, Jackson & Begley, Danville, for appellee.

COMBS, Justice.

Dr. D. H. Coleman filed this suit for divorce against his wife, Susan Coleman, alleging the statutory ground of cruel and inhuman treatment. Mrs. Coleman filed first a general denial to the petition but later, by counterclaim, asked for a divorce and for alimony. The chancellor declined to grant an absolute divorce to either party but did grant to each of them a divorce from bed and board and awarded Mrs. Coleman alimony in the amount of $350 per month. Dr. Coleman contends on this appeal that the chancellor should have granted him an absolute divorce. Mrs. Coleman insists on cross-appeal that the amount of alimony awarded to her is insufficient. Her attorneys, who have been made parties to the appeal, contend that the attorneys' fee of $1,500 awarded to them is too small.

The chancellor has filed a comprehensive opinion in which he analyzes the facts and what he considers to be the applicable law. While we do not agree with his conclusions of law, we adopt his statement of the facts. His statement follows:

"Plaintiff and defendant were married December 27, 1950. A few days later they left for Florida, on a wedding trip, and also to give Dr. Coleman, a busy doctor, a period of rest and relaxation. He has suffered from heart trouble for some years. She, it may be noticed, has high blood pressure. They came home toward the last of April. The next January they went back to Florida, staying until the first of May, 1952. On the fifth of the next September, he filed this suit for divorce, on the ground of cruel and inhuman treatment. In her original answer, Mrs. Coleman, while alleging he was guilty of cruel treatment of her, did not ask for divorce, but only alimony. However, after all the evidence had been taken, she amended, and sought an absolute divorce on that ground.

"At the time of their marriage, Dr. Coleman was 58, and she was 49. It was the second marriage for each. His first wife died in 1945. They had no children. Defendant had been divorced a year or two prior to 1945. She and plaintiff had known each other a good while, he having been her family physician during the period of her first marriage. After his wife's death, they had been in each other's company a great deal, for three or four years before their marriage. Her son of her first marriage, Bill Curry, now 10 years old, lived with them. The evidence is that Dr. Coleman was devoted to this child, and desired to have him in their home.

"Both like to play bridge, and enjoy having their friends in to play with them.

He also plays golf, playing a good deal both at home and in Florida. But she does not play golf.

"The evidence that is material in this case consists almost exclusively of the testimony of the two parties. With one or two exceptions, which will be noticed in the course of this opinion, the behavior of which any serious complaint is made took place when only these two were present. What others testified about was the demeanor of Dr. and Mrs. Coleman in the presence of guests in their home, or when elsewhere in company. As to their testimony, it is not of enough significance to justify more than a recital of its general tenor. But as to the testimony of plaintiff and defendant it is necessary, in order to see the picture each sketches of their married life, to give a somewhat lengthy summary of that testimony. And it will make for an easier understanding of their troubles to notice the particular complaints each makes against the other, and in each instance give their respective versions of what happened.

"Dr. Coleman testified Mrs. Coleman had a violent temper; was extremely jealous, and very suspicious. For these reasons she kept him emotionally upset and under terrific strain. While in Florida the first time, he frequently played golf with Mrs. Walter McMakin, who he had known for some ten years. Mrs. Coleman was jealous of her. And she was jealous of his sisters-in-law, Mrs. Walter Coleman and Mrs. Lewis Charles Coleman, widows of his deceased brothers. She was jealous of Mrs. Davis a widow with whom he had sometimes gone prior to his marriage with Mrs. Coleman. She did not care for his own sisters, and made this noticeable when in their presence. She disliked some of his best friends; did not want to have them in to play bridge; would speak critically of them to him.

"Mrs. Coleman testified she was not jealous of any of these persons; that she did not dislike his sisters; tried to be pleasant with all of his family; that Mrs. Walter Coleman did not seem to like her,

and she rarely saw her. Some of his friends had not been agreeable with her before the marriage, and she did not feel under social obligations to them; for this reason, in some instances, she did not invite them to their home, or care for their company. She said she informed her husband of these circumstances.

"Dr. Coleman stated that on one occasion while they were in Florida the first time she accused him of immoral relations with Mrs. McMakin, and slapped him in the face. He told her that if that was the way she felt towards him, the thing to do was for her to go to her home, and he to his. Her version is that the McMakins were around so much that she told her husband that she was fed up with them; they had an argument; he told her he was going to take her home and get rid of her; that she slapped him, he then slapped her, pushing her over on the bed, twisting his fist in her throat. But Dr. Coleman declared all that he did was to hold her wrists to restrain her, when she attacked him.

"He was helping with the education of one of his nephews, son of Mrs. Lewis Charles Coleman, sending her checks for that purpose. He stated that because of this defendant referred to this sister-in-law as his girl friend, and spoke of his keeping her. Defendant denied this, saying, further, that she and plaintiff had an understanding before marriage that he was to send his nephew to school.

"As to her jealousy of Mrs. Walter Coleman, he told of his writing a letter to the latter in reply to her sending him newspaper clippings about her son as a basketball player; that he left this letter in the house to be mailed; his wife opened and read it, and then said to him that she knew Mrs. Walter Coleman was in love with him, and would have liked to marry him after her husband's death. Defendant testified she made no such statement; but that he gave her the letter to mail; that she did read it and thought nothing of it, as he left family letters for her to read.

"Then there was the occasion he told of when he had arranged for a dinner for

members of his family, including Mrs. Walter Coleman, at Beaumont Inn, and his wife, upon learning the former was invited, announced she would not go, and he had to call off the dinner. Her account of it was that he called it off because she had invited another sister-in-law, Mrs. Ethel Coleman, widow of Lee James Coleman, who, according to the statement she attributed to him in explanation of his cancelling the dinner, was not on friendly terms with some other members of the family he had invited.

"Dr. Coleman kept one car, which served both for professional and family use. Several of the unpleasant affairs that disturbed this marriage, and of which he speaks, resulted from this fact. He testified she 'jumped on' him several times when he had the car and she wanted to use it. Once when he was ready to enter an ambulance to go bring in a patient to the hospital, he had to wait for Mrs. Coleman to return with the car because his medical bag was in it. He asked her in the future when taking the car to please leave the bag. In a loud voice she told him to shut his mouth. He asked her not to talk so loudly, as people would hear her, and she then told him to go to hell. Mr. Norton, in charge of the ambulance, was present, and he corroborated Dr. Coleman. Mrs. Coleman admitted she told him to go to hell, because he kept 'raving' about her taking his things out, and she wished to make him hush.

"As to her jealousy of Mrs. Davis, he testified that Mrs. Coleman accused him of running around with her, and meeting her at places in Harrodsburg and Lexington. Mrs. Coleman denied making such an accusation.

"They occupied, throughout their married life, separate bed rooms. He complained of her coming several times into his room after he had gone to sleep, awakening him, and accusing him of things he had not done, naming once when she was talking about his contributing to the support of his nephew, and another when she insisted on his buying a car. Mrs. Coleman testified she did go into his room after he had gone to bed on several occasions; that she went

just to be with him. She said once when she went there he told her he did not want her to come into the room unless she was invited.

"In January, 1952, he went again to Florida. About two weeks later she and Bill joined him. According to him, he then felt they were not happy, and it would be best for both that they be divorced; when he took this up with her, she suggested he go to Florida and stay three months, to think it over. Her testimony is that there was no talk between them of divorce; that she had her things ready for going with him, when he informed her he was going alone. It appears from the testimony of both that about two weeks later Mrs. Coleman and her son joined him, after writing and asking his permission to come and he replied consenting. They were in Bradenton, where he was staying, several days, then went on to Delray. He said she was in bad humor when she got off the train at Bradenton, because he had not met her in Tampa, and was mad as long as she was there; that she insisted on going to Delray, where she had friends, though he desired to stay on in Bradenton, where his nephew, Clell Coleman, was; but to please her they left there. She denied she was in a disagreeable frame of mind when she got to Bradenton, or mad while there. She said while in Bradenton, he was 'all right'; that they stayed in Delray three months, and at no time was there any misunderstanding until the incident regarding the purchase of the Squifflett residence, dealt with presently.

"He testified she made it very unpleasant for him while in Florida; that she would not speak to some friends of his from Harrodsburg who were there; that she refused to go to the races with him because she would be thrown with a lady whom she did not like and who did not like her, but whose parents were his friends. Mrs. Coleman testified that when she explained to her husband the circumstances, they agreed upon the excuse he would give for their not going, and that there was nothing unpleasant on that occasion.

"Coming to the incident relative to the purchase of the Squifflett property, they had looked at several homes in Harrodsburg with a view of making a purchase for their residence, as Mrs. Coleman did not like to live in an upstairs apartment. Among others was the Squifflett house. While they were in Delray, he told her he was not going to buy that property. He said he stated to her that it took more than a house to make a home; that it took respect and consideration for each other. She became indignant when he informed her he would not make the purchase and declared she was going home the next day. Mrs. Coleman testified that he also said that he wanted a divorce, and that when she told him she could not give him a divorce, he declared he was going to pay her off and get rid of her; that they would be better off if she would go home; that she then made arrangements to do so, but changed her mind because he had already paid the rent on the Florida house. She said this took place in March, 1952; they stayed until about the first of May, and the subject was not again mentioned; that they got along very nicely, and on their return to Kentucky took it leisurely, and had a most enjoyable trip. So far as I can find, Dr. Coleman does not speak of any other unpleasantness between them in Florida after that. But he did testify that he was under 'terrific strain all the time; I never knew what to expect.'

"Some three months after their return to Harrodsburg, and on the 4th of August, 1952, he testified that he told Mrs. Coleman that he had thought about it a long time; that he hated it on Bill's account, and the publicity of it, but that she should get a divorce; that if she wouldn't, he would; that this was his decision after trying for 20 months to make a success of their marriage; she became angry; declared she would never agree to a divorce; that he then informed her he would not mention it to her again, but if she wanted to discuss it with him, she could; that she said she would ruin him financially, socially and professionally if he persisted in getting a divorce.

"Mrs. Coleman's version is as follows: That August 4th was his birthday; that in his honor she had invited his sisters and two or three others to a dinner; after the guests had departed, Dr. Coleman had remarked to her that it was a nice party, and then went to his room. She felt hurt because he showed no more appreciation for her dinner, and started to cry. He came back, and said, 'What are you doing now? It was a very nice party', and returned to his room. Later on that night she went into his bed room to talk with him, asking him what was the matter. His reply was, that he was through, was not going to live with her; he would give her $10,000.00, and wanted her to get out. She said to him she did not go into the marriage with that in view, and could not do it.

"On September 4, 1952, Dr. Coleman left the house, and the next day he filed suit for divorce. He testified he told Mrs. Coleman he was going on a vacation. He did not tell her he was separating from her, because she was going to have a party that afternoon and he did not wish to interfere with it, and he realized if he told her it would. As she related it, he told her he was going on a little trip. He had her help him pack his things. He did not tell her where he was going, nor did she ask him. Before leaving, he kissed her three or four times. The next time she saw him was at the time he gave his deposition about the first of October.

"Mrs. Coleman also testified that from August 4, 1952, when they had the unpleasantness mentioned, until he left on September 4, he had been 'most considerate', and she believed they had never been happier.

"For some years defendant and Mrs. Ethel Coleman had been very close friends, though at the time of her testimony about to be noticed their friendship had been chilled, each giving her explanation for this. She testified that defendant told her that Dr. Coleman was seeing Mrs. Davis at places in Harrodsburg or Lexington; also, that she had found letters Mrs. Edith Coleman had written him and felt she was after

him. After their separation, she told her that she did not know if she had ever loved Dr. Coleman, that she thought she married him just to show the Coleman family and the people of Harrodsburg she could. Defendant denied she made the statement about Mrs. Davis; said she had never told Mrs. Ethel Coleman Dr. Coleman was going around with any woman; that after their separation there were rumors of that kind and she and her sister-in-law talked of the rumors.

"There is testimony for plaintiff from persons who had known him a long while that since his present marriage a marked change had come over him; that he appeared to be under a strain, and depressed. Some who had been guests in their home spoke of instances when Mrs. Coleman addressed him rather sharply in criticism of his card playing; of her lack of cordiality with some of the guests, old friends of his; of an air of tension and reserve between this couple in the presence of others. Clell Coleman, his nephew, who was with him in Bradenton at the time Mrs. Coleman came there, corroborated Dr. Coleman's evidence as to her being in a disagreeable humor upon arrival, and of her staying that way as long as she was there.

"Mrs. Coleman expressed herself as having a grievance because Dr. Coleman did not ask her to go with him when he went with Mr. Gabhart in the summer of 1951 to North Carolina to play golf. But shortly after getting there he had her to join him, they spent about two weeks there, and she declared they had a happy time together. She felt hurt because he did not ask her to go to Martinsville in the fall of 1951, when he and Mr. Peters went there. But obviously she at the time did not regard it seriously. She phoned him; he wrote her, while there, and it is apparent from her testimony as to what he told her when he came home that he was sorry he had not asked her, as the treatment might have been helpful to the trouble she was then having with her back.

"She testified that after the first year of their marriage Dr. Coleman frequently got after her about how much money she spent, until finally, rather than say anything to him, she bought her clothes with her own money; that while on the outside he has an even temper, occasionally he 'blows up', but she added that at such times he would not say anything disagreeable to her except about money matters. Dr. Coleman testified that he arranged for her to have a monthly allowance; in addition, she had a charge account at stores in Lexington and Cincinnati, and that his bookkeeper was instructed by him to pay all bills presented as having been made by her; that he did propose to her to close the charge accounts, and go on a cash basis, and that she closed them. She said he had these closed.

"To see their domestic life in better perspective, other testimony from him and from her should be noticed. He testified that from the time they married until the incident about Mrs. McMakin, which was in late April, their relations were 'reasonably agreeable'; until then he 'had a deep affection for her'; that even after that quarrel they went to dinner together that evening, then to the picture show. Upon their return to Harrodsburg from the first stay in Florida they went out together frequently, several times each week, and made it a practice to have friends for 'bridge' at least twice a week. He took her to the Lexington Country Club; to Idle Hour Country Club; to Cincinnati to attend the theatre. At his suggestion, they planned to visit her sister in Ohio, the latter's sickness interfering with this arrangement. In July, 1951, he went to North Carolina for an outing, to play golf. He had her and Bill a day or so later to join him, and he stated he enjoyed being with her there. When they came home from the second Florida visit, and on until the separation, as I read his testimony they kept up the same social pattern, going out together and having friends in to play cards. And when he wrote Mrs. Coleman relative to her joining him in Florida in January, 1952, in response to her letter that she and Bill would like to be in Florida, he signs it 'Love, Hunter.'

"As for Mrs. Coleman, she testified that while in Florida the first time their relations

were agreeable, except for the quarrel over Mrs. McMakin; that they were cool with each other for three or four days after that; then they became reconciled, she kissed him, and after that everything, as she put it, 'was all right'; that after she got home she was happy; there was no lack of courtesy or proper attention on the part of Dr. Coleman noticeable to her; they had their card games, and their evenings out; while her testimony relative to their Florida visit seems at times to imply she felt he played golf so much as to be neglectful of her, she declared that she was glad for him to play, as he needed it, on account of his heavy professional cares. He treated her 'fine' on the North Carolina outing. When in Florida the second time there was no unpleasantness except that relative to the Squifflett house. But after that he was very nice to her, and that subject was never again mentioned between them. She cited as showing their relations were subsequently agreeable, that they took four days to drive home, and 'had a most enjoyable trip.' And, as previously noted, she declared that the last month they were together he was very considerate, that in her opinion they had never been happier. In her letter to him about joining him in Florida in January, 1952, she addresses him as 'Darling', tells how 'pepped up' she and Bill were at the idea of coming to him and signs it 'With lots of love, Susan.' And while she now seeks to be divorced, in her testimony she avows her love for him and desire to live with him."

This court is of the opinion that under the foregoing statement of facts Dr. Coleman is entitled to an absolute divorce. Although we find no evidence of moral delinquency on the part of either party, it is apparent we think that they will never be able to live together with any degree of satisfaction or contentment. Most of their troubles seem to have grown out of a clash of temperament and personality. We gather from the record that Dr. Coleman is a man of placid temperament but somewhat sensitive about his relations with the public and especially with his acquaintances and friends. He appears to be a man of considerable pride to whom anything resembling a public scene or demonstration is abhorrent. Mrs. Coleman, on the other hand, appears to be of a mercurial temperament, given to impulsive statements and at times to outbursts of temper. If the parties were younger and more pliable there might be hope that the exigencies of raising a family and making a living would lead to such adjustments as would be necessary to enable them to live together in some degree of harmony. But such is not the case. Both parties have reached the age where major adjustments, especially in matters of personality and temperament, are not easily made.

The chancellor based his conclusions largely on that line of cases of which Purcell v. Purcell, 197 Ky. 627, 247 S.W. 760, is typical, where it was said that unless there is evidence of physical violence it is only persistent, studied and habitual conduct which will be treated as cruel and inhuman treatment as that phrase is used in the divorce statute.[1]

It will be noted that the last part of subsection (d) of the statute is in the alternative. That is, the cruel and inhuman treatment may be either such as to "indicate a settled aversion to him *or* to destroy permanently his peace *or* happiness". (Emphasis ours.) It occurs to us that in the Purcell case and others of like import the court was talking about the behavior necessary to establish a settled aversion rather than that which might destroy peace or happiness. Unless this is the correct interpretation of those cases, then it seems to us that the court completely overlooked the last line

---

1. KRS 403.020(4) (d) which provides:
    "(4) A divorce may be granted to the husband for the following causes:
      "(a) * * *
      "(b) * * *
      "(c) * * *

    "(d) Habitually behaving toward him, for not less than six months, in such cruel and inhuman manner as to indicate a settled aversion to him or to destroy permanently his peace or happiness; * * *."

of subsection (d) which reads "or to destroy permanently his peace or happiness".

We can readily understand why it would be necessary for the misconduct to be "studied," i. e., intentional, in order to establish a settled aversion. But we do not agree that such misconduct necessarily must be studied in order to destroy the peace or happiness of the aggrieved spouse. Assuming that the wife's behavior, amounting to cruel and inhuman treatment, has continued for the requisite length of time, we think that a fair interpretation of the statute is that a divorce may be granted to the husband when either of two alternatives is shown to exist: (1) a settled aversion by the wife toward her husband, or (2) the wife's behavior is calculated to destroy permanently his peace and happiness.

In this case, for instance, we find no evidence that Mrs. Coleman has developed a settled aversion toward her husband; but at the same time we are of the opinion that her conduct and attitude are calculated to destroy her husband's peace of mind, if not his happiness. This is especially true in view of the condition of Dr. Coleman's health, which of necessity requires that he live a quiet, well-ordered life. The word "happiness," of course, is a relative term which cannot accurately be defined or gauged and we do not attempt to do so. It will be noted, however, that the statute does not make it a specific requirement that the aggrieved party's happiness be destroyed; it is sufficient if either his peace or his happiness has been destroyed.

■ It is obvious, we think, that the word "permanently," as used in the statute, does not mean forever but has reference to the duration of the marriage. This requirement is met, therefore, when it is established that the aggrieved party's peace or happiness has been destroyed to such extent that it cannot be regained so long as the marriage exists. Cf. McClintock v. McClintock, 147 Ky. 409, 144 S.W. 68, 39 L.R.A.,N.S., 1127.

It was pointed out in Woosley v. Woosley, 203 Ky. 209, 261 S.W. 1112, that the word "habitually," as used in the statute, does not necessarily mean continuously.

■ It is suggested in the brief for Mrs. Coleman that Dr. Coleman himself is not free from fault. We do not say that he is. But we note that although the statute requires that a wife, in order to obtain a divorce on the ground of cruel and inhuman treatment must be without like fault, there is no such limitation upon the right of a husband who seeks a divorce on the same ground. Muth v. Muth, 314 Ky. 531, 236 S.W.2d 469. We can think of no logical reason for the distinction but this whole subject is governed by statute and it is the duty of the courts to follow the legislative enactment.

■ A divorce from bed and board is a poor arrangement at best. It is said in 27 C.J.S., Divorce, § 160, p. 786, that "It is usually preferable to grant an absolute divorce; and such a divorce may and should be granted where there appears to be no possibility of a reconciliation being effected after a divorce from bed and board."

In Keezer on Marriage and Divorce, Morland's Third Edition, 1946, section 244, it is said in regard to divorce from bed and board: "The English courts have said it is throwing parties back upon society in the undefined and dangerous characters of a husband without a wife, and a wife without a husband. * * *. Legal separations are expressly prohibited in some states, and in others are unknown. It has been a disputed question whether they serve any useful purpose. The weight of argument and authority is against them. To be sure, they may possibly secure a judicial settlement of matrimonial troubles and give an innocent wife protection from a cruel or drunken husband; but the same result could be obtained by divorce, alimony, and a restraining order or injunction, and leave the parties in a much better position for themselves and before the community. Mr. Justice Swift says, 'it places them in a situation where there is an irresistible temptation to the commission of adultery, unless

they possess more frigidity, or more virtue than generally falls to the share of human beings.' "

There are exceptional cases, of course, where a divorce from bed and board is the best possible solution, but it is generally agreed by both the courts and the text writers that this sort of decree should be resorted to only in those extreme cases where there is no other adequate solution to the problem.

■ Since we are of the opinion that Dr. Coleman is entitled to an absolute divorce, we look now to the question of alimony for Mrs. Coleman. The general rule is that permanent alimony will not be awarded to a wife when her husband is granted a divorce because of her fault or misconduct. Damron v. Damron, 301 Ky. 649, 192 S.W.2d 473; Toomey v. Toomey, Ky., 237 S.W.2d 533; Humphress v. Humphress, Ky., 240 S.W.2d 625. But there are a few recognized exceptions to this rule. For instance, where the ground for divorce is five years separation it has been held that the wife may be entitled to alimony although the husband is granted the divorce. Cotton v. Cotton, 306 Ky. 826, 209 S.W.2d 474; Sandlin v. Sandlin, 289 Ky. 290, 158 S.W.2d 635.

■ It has also been held that if the wife is not wholly at fault and is not guilty of any moral delinquency she may be entitled to alimony although a divorce is granted to the husband. Sharp v. Sharp, 302 Ky. 426, 194 S.W.2d 835; Luke v. Luke, 276 Ky. 683, 125 S.W.2d 251; Muth v. Muth, 314 Ky. 531, 236 S.W.2d 469. We think this case falls within the last exception. It appears that Dr. Coleman is possessed of an estate estimated at $350,000 and has a substantial income. Mrs. Coleman has little, if any, estate other than a home of the estimated value of $13,000, on which there is a mortgage of $3,400. She is now 53 years old and has no trade or profession by which to earn a living. It is not shown that she has been guilty of any moral delinquency. Moreover, we are not willing to say from this record that Dr. Coleman

is entirely free from fault. Under these circumstances, we think Mrs. Coleman is entitled to alimony.

■ This case has been pointed toward the primary issue of whether Dr. Coleman is entitled to a divorce. There is very little discussion in the briefs on the question of the amount of alimony to which Mrs. Coleman may be entitled in the event of an absolute divorce being granted to her husband. The award made to her by the chancellor is based on the decree of divorce from bed and board. Under this sort of decree a wife retains many of the legal attributes and rights, including the right of inheritance, which the law gives to her as a wife. The chancellor, no doubt, took this into consideration in fixing the amount of Mrs. Coleman's alimony. Since we are directing that an absolute divorce be granted to Dr. Coleman, a different approach should be made to the question of alimony. And since the chancellor has not had an opportunity to fix alimony upon the basis of an absolute divorce to Dr. Coleman, we think the case should be remanded to him for that purpose. We will not suggest to the chancellor the amount of alimony which should be awarded in this case, nor the manner in which it should be paid. He is thoroughly familiar with the case and with the factors which should be taken into consideration in fixing alimony.

■ The only remaining question concerns the amount allowed as a fee to Mrs. Coleman's attorneys. We have said frequently that the chancellor has wide latitude in matters of this sort and that this court will not interfere unless there is a clear abuse of discretion. It appears that Mrs. Coleman's attorneys have done a substantial amount of work in this case and they have ably presented her side of the issues. The transcript of testimony before us consists of 302 pages. The size of the record is not conclusive, of course, as to the amount of work performed but does furnish some criterion as to the amount of time spent in taking proof. In view of the questions involved, the amount in issue, and the work performed by the attorneys,

we think the amount of $1500 allowed to them is very conservative but we cannot say there has been an abuse of discretion in this respect. If the attorneys have additional duties to perform upon return of the case to the circuit court, the chancellor will have the authority to supplement the amount of their fee, if he desires to do so.

The judgment is reversed with directions to the chancellor to grant an aboslute divorce to Dr. Coleman, to make a suitable award of alimony to Mrs. Coleman, and for other proceedings consistent with this opinion.

CAMMACK, J., not sitting.