## Luke v. Luke et al.

Feb. 7, 1939.

B. M. LEE for appellant.

E. H. JOHNSON for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming in part and reversing in part.

Mrs. Marie Luke seeks a reversal of that part of a judgment of divorce which denied her alimony and limited the allowance for the care of her child to $1500. The appellee is William Isaac Luke.

The parties were married in August, 1927, when each was seventeen or eighteen years old and attending school. The young man had been reared by his grandparents and they and her parents set them up in housekeeping after a few months. In July following, about a month before their baby was born, the young husband, with only trivial justification, left his wife and went west. She heard nothing from him until three years later when she received advice from an attorney that he had filed suit for divorce in California. Getting in touch with him through the attorney, in time they became reconciled and his grandfather provided means for her to go to him. About two years later he furnished money for the young couple and their baby to return to Harlan County. Again they were set up in their own home.

The young man was capable, having received an excellent grade in an examination as to his qualification as a mine foreman. He had different jobs with relatively small pay, and at all times his grandfather seems to have contributed much to the support of the young family. In February, 1935, Luke was seriously wounded by a pistol shot fired in his home. At the time he made a sworn statement to a Justice of the Peace and other substantial and disinterested persons that he had accidentally shot himself and cleared his wife of any responsibility. She says he was getting over a protracted drunk and tried to commit suicide. However, on this divorce trial he charged his wife with having shot him. Not only does his own statement, which is shown to have been made when conscious and fully aware of the situation, but the attendant circumstances show that she had not.

After his recovery the parties lived together but his habit of drink did not make life very pleasant for her. Finally, in the latter part of 1935, according to the wife, after being drunk in bed for two or three days, with a companion, he proceeded to fire his pistol into the floor, and she went to his grandfather's. According to the appellee his wife reached for the pistol on the table near the bed where he was lying, and he grabbed it and fired it into the floor for the purpose of unloading the pistol and preventing her shooting him. Again the circumstances corroborate the wife. After this the young man went to Chicago for several months. While he was away the wife obtained a position as clerk in the Benham postoffice for $52 a month. He came back in the spring of 1936 and they lived together, but the going was rough. In addition to the habit of drinking, for a brief time he used morphine or other narcotics. They had been making their home with his grandparents, at their invitation, until the grandmother suggested that they had been married for a long time and should be living to themselves. So in May, 1936, Mrs. Luke took her child and went to her father's. They did not afterward live together.

The young man seems to have spent his time enjoying life as a free lance, and "sparking" a certain young lady. They went about together a great deal and frequently played tennis on a court adjoining the post office where the wife could see them. In other ways he seems to have made no effort to avoid aggravating and

embarrassing her by his attentions to other young ladies. There is evidence also that he sometimes frequented a disreputable roadhouse and associated with, at least, questionable characters.

On the other side, the appellee testified that his wife was irritable and preferred to stay at her mother's home and insisted that she did not want to live with him. It was after an argument over his attentions to her cousin, for which he says there was no justification, that he left her in July, 1928, and went to Denver where he attended school and later joined the Navy. His impatient action and lack of consideration for his young wife, then in a delicate condition, is a reflection upon the husband. His testimony is to the effect that thereafter when they had become reconciled and returned from California, she was nagging and quarrelsome because he did not go to work, which he says he was incapacitated to do. This was followed by her shooting him as above stated. Later on she would quarrel at him because he would not go out every week-end to dances, which he declined to do because he had been working twelve hours a day and was tired. In short, the appellee's evidence is that he was always considerate of his wife and that she was to blame for their quarrels and inability to get along. There is some slight evidence that she too had indulged in intoxicants once in a while, but otherwise there is no sort of reflection upon her character or conduct. The husband testified that she could not get along with his grandparents and left him and refused to live with him any more. His evidence is to the effect that he was in poor physical condition and unable to work during the times he was not employed, and that his attentions to the young ladies referred to were merely courtesies. He denied having frequented disreputable places.

The judgment expressed the opinion of the court "that neither of the parties to this action is without fault, and for that reason the court allows no award of alimony or support to the plaintiff on her claim for maintenance." However, it adjudges the husband an absolute divorce on his counterclaim. The custody of the child, a girl then 6½ years old, was given to the mother, with the right of the father to visit and see her at any reasonable time.

Shortly before this suit was filed, a friend of the

husband's grandparents bequeathed him an estate of about $5800, which was attached by the plaintiff. The court adjudged $1500 of this money should be paid to the child's guardian for her support and authorized its expenditure at the rate of $20 a month for that purpose.

It seems to us that the divorce should not have been granted to the husband. The wife had stated in her testimony she did not want a divorce. As we appraise the evidence it entitled her to such a decree. But accepting the chancellor's opinion as to the joint responsibility of the parties and that the wife did not prove her right to a divorce, in either event, this court is warranted in awarding her alimony and maintenance. The right thereto is founded on the husband's duty to maintain his wife. Miller v. Miller, 229 Ky. 436, 17 S. W. (2d) 412; Pelphrey v. Pelphrey, 231 Ky. 80, 21 S. W. (2d) 122; Jones v. Jones, 239 Ky. 153, 39 S. W. (2d) 262; Burns v. Burns, 256 Ky. 834, 77 S. W. (2d) 418.

Regardless of the conflict tending to show responsibility for the breach of the marriage tie, it is a certain fact that the husband has contributed nothing to the support of his wife and only $10 to the support of his child for some time before May, 1936, and nothing since then except to pay a temporary award of $10 a month for the child after the suit was filed. We think the record justifies the conclusion that the child and the wife both should be given a portion of this fund. The appellee has been recently attending an embalmer's school in Cincinnati, and it appears that the grandfather advanced him $1000 for his expenses, for which he has given a note payable out of his bequest. If we take that into consideration, there remains about $4800. The award to the child is small enough, but doubtless his love for his little girl and an appreciation of his moral and legal responsibility will cause him, voluntarily, to see that her financial needs are taken care of if and as more funds are required for that purpose. We are of opinion, however, that the court should have awarded the wife $1000 alimony. Even this will leave him the larger part of his estate for his personal use.

The judgment is accordingly affirmed in part and reversed in part.