**Max M. BROIDA, Appellant,**

v.

**Miriam BROIDA et al., Appellees.**

Court of Appeals of Kentucky.

Dec. 18, 1964.

As Modified on Rehearing
March 26, 1965.

---

David L. Gittleman, S. Arnold Lynch, Sales & Lynch, Louisville, for appellant.

Joseph Davis and Joseph R. Rubin, Louisville, for appellees.

PALMORE, Judge.

Max and Miriam Broida were married in 1941. She brought this divorce suit against him in 1960. By counterclaim he also sought a divorce. In November of 1961 Chancellor Blakey Helm entered findings of fact, conclusions of law and a judgment granting Miriam a divorce, custody of and $100 per month each for the support of their two infant children (one of whom, a son, has now attained the age of 21), and $300,000 alimony payable one-third in 30 days and the balance in six months. Miriam's attorneys were allowed a $20,000 fee and expenses in the sum of $3,640. Max moved at once to amend the judgment, and the matter came on before Judge Helm's successor in office, Hon. Lyndon Schmid. After a deliberate and careful review of the proceedings Judge Schmid entered further findings and conclusions and an amended judgment reducing the alimony to $279,078 and making it payable $100,000 in 60 days, $79,078 one year later, $50,000 in two years, and the remaining $50,000 in three years. The amended judgment cut the $20,000 fee to $18,600 but allowed an additional $1,860 for services rendered after the first judgment. The $3,640 allowance for expenses was left intact.

Both parties appeal. Max claims the alimony is excessive and is payable over too short a time. He contends also that both the fee and expenses allowed her attorneys are unreasonable. The attorneys are made parties on his appeal. Miriam complains that the alimony award is not enough.

At this time Max is about 66 and Miriam is in her fifties. A highly successful business man, he had a substantial net worth when they were married in 1941 and has accumulated a great deal more since then. She had no property at the time of the marriage, has not earned any income, and has no estate of her own.

The value of Max's estate was calculated as of June 1, 1961. Judge Helm concluded that the amount of alimony should be approximately one-third of the estate accumulated by Max during the marriage. Excluding properties owned in 1941 and still owned, and after making a further deduction of $52,000 for other assets then owned but since disposed of, Judge Helm found his net worth in 1961 to be $919,136. The only difference in this respect between the first judgment and the amended judgment is that Judge Schmid determined that certain stock given by Max during the pendency of this action to his son by a former marriage should not be counted as part of his estate.[1]

Both parties have submitted lengthy briefs contesting every spike in the railroad. In their zeal not to miss a twig in the forest they overlook the simple truth that the valuation of complex business interests is largely speculative at best, and that the fixing of alimony, especially when it reaches six figures, must be a broadbrush affair anyway. After the perspiration shed on this record by two able and conscientious chancellors we decline the stultification of picking at every hair on the brush.

Most of the smoke and din of battle swirls around the evaluation of Max's 70% interest[2] in a corporation holding a "sandwich" leasehold of miscellaneous real estate in Honolulu, Hawaii. This leasehold, purchased in 1954 at a price of $210,000, runs until 1991. Until November 15, 1960, the rent payable by the corporation to the owners of the property was $2,500 per month, and the rents received from subtenants in the month immediately preceding that date totalled $5,085. By virtue of escalation clauses in the master lease and most of the

1. The transfer was made before June 1, 1961, the date as of which all valuations were calculated. Its purpose was to match similar gifts theretofore made to each of the two children born to Max and Miriam.

2. The other 30% is the stock mentioned in the preceding footnote as having been given to the children.

subleases (which extend over the same term as the master lease), as of November 15, 1960, the rent payable to the owners under the master lease was increased to $9,375 per month and the rents receivable by the corporation from the subtenants also were increased. In May of 1961 the gross rent collected from the subtenants was $15,050. All improvements on the property were constructed by the subtenants, and there is no maintenance expense to the sublessor corporation.

As may be seen from the foregoing figures, in November of 1960 the asset for which $210,000 was paid in 1954 was earning $31,020 per annum before administrative expenses and taxes. In 1961 this figure had increased to $68,100. The trial court placed a value of $641,000 on the leasehold, calculated through capitalizing the *net* income at 9⅓%. It is not clear just how the court arrived at the net income figure of $59,805 which was necessary to produce this result, but apparently it represented an adjustment from a figure of $56,305 given by the company's accountant. At any rate, both parties make vociferous outcry at the result. Max contends the net income should have been capitalized at something between 12% and 18%, and Miriam claims the rate should have been about 6%. Max argues also that the information obtained from the accountant (by deposition) was privileged[3] and should have been suppressed on his subsequent motion. Miriam, on the other hand, points out (correctly, we believe) that the expenses deducted by the accountant in arriving at the net profit figure include several items that should not have been considered for valuation purposes. To all of these arguments, both ways, we could add some of our own, but the spirit of the season bids us to refrain from inflicting on the readers of this opinion any more of what the writer has endured already under the dead weight alone of this record and these briefs.

■ There is, in our opinion, plenty of evidence to support a conclusion that the net income of the Honolulu corporation is at least $50,000 to $60,000 per annum. The allegedly privileged information elicited from the accountant is more helpful than harmful to Max's case because, if it were excluded, it would be necessary to calculate entirely on the basis of the gross difference between rental figures payable and receivable.[4] Conceding that this income may fluctuate upward and downward by reason of the escalation clauses and other vicissitudes incident to the type of property and tenants involved, it is reasonable to anticipate that it will not fall materially below the present level, and there are several rules of thumb that should have probative weight in determining the value of the master lease. For example, the present value, at 6%, of $1.00 per year payable at the end of each year for 30 years is approximately $13.765. That is, an investor lending his money at 6% interest would have to pay $688,250 for a guaranteed payment of $50,000 per annum for 30 years.[5] We know, of course, that $50,000 per annum from the Honolulu property is not guaranteed, and we know also that what the corporation nets is not necessarily income to the shareholders, but quite aside from other testi-

---

3. Cf. KRS 325.440.

4. Under CR 32.03, objections are not waived unless they are such that they could have been obviated, removed or cured by the adverse party had they been seasonably urged. Max argues that the objection on the ground of privilege could not have been cured or avoided even if it had been raised when the deposition was taken. This is too narrow a view. It would not have been equitable to suppress the deposition, because, after it was taken and before the motion to suppress was made, Miriam agreed to a stipulation that no more valuation testimony would be taken.

5. Am.Jur.2d Desk Book, p. 332 (Document No. 133). Max's Honolulu banker testified that an average investor in real estate should receive a net return of 6%. At 4%, the present value of $1.00 per year for 30 years is $17.292, or $864,600 for $50,000 per year.

mony we have not specifically mentioned, this comparison suggests that a $641,000 valuation of the stock representing corporate ownership of the Honolulu leasehold is not excessive. As we have said, what a willing buyer would pay a willing seller for such an asset involves a great deal of guesswork anyway.

■ The values of assets other than the stock in the Honolulu company were stipulated. Miriam objects to the trial court's having confined its alimony formula to the property accumulated during the marriage. She claims she ought to have one-third of the entire estate. We agree that Heustis v. Heustis, Ky., 346 S.W.2d 778 (1961), does no more than suggest a *minimum* allowance. Certainly Heustis does not mean the wife cannot be allowed the equivalent of one-third of the entire estate, or even more if the chancellor in his reasonable discretion sees fit. But as the size of the estate increases it becomes less important that the award of alimony conform precisely to a formula. It is our opinion that the principal amount awarded in this case was not unreasonable to either party.

■■ But Max complains, with a good deal of reason, that if he is going to be forced to liquidate capital assets in order to pay the alimony the court should consider the income tax consequences (which he introduced evidence to prove) in determining the value of the estate available for division. We concede that when the necessity of such a liquidation (or, for that matter, a transfer of capital assets directly to the wife) is reasonably certain, the tax impact should be considered. Indeed, even in the event of periodic alimony common sense requires that consideration be given to the post-divorce tax positions of the parties, to the end that the payments may be so balanced as to leave a maximum of tax-free dollars to both. There is no need for, and every reason to avoid, making the taxing authorities beneficiaries of the litigation. For this among other reasons we have concluded that it would be unreason-

able to require Max to meet the schedule of payments decreed in the final judgment, and that a more just arrangement would be achieved by permitting the fixed obligation to be satisfied over a period of several years.

Section 71 of the Internal Revenue Code provides in effect that when a fixed award of alimony is payable over a period of ten years or less there is no federal income tax incidence. Though it would be greatly to Max's advantage to be able to deduct such payments from his taxable income, at the same time Miriam would be required to treat them as taxable income to her. If we knew in advance what the future holds it might be feasible to extend the installments beyond ten years and fix the total at such higher amount as would offset Miriam's taxes out of what Max would save through being able to deduct the payments. However, he is 66 years of age and not in good health. Tax rates are changing and are subject to further change. Though he may in fact pay the alimony out of current income, it is supposed to represent her share of his capital assets, and it is our purpose to give him, in effecting its transfer, some freedom of choice as compared with what the situation would be under the existing judgment of the circuit court.

■ Because the alimony award will be payable over a longer period of time we have determined that the total should be rounded to $300,000, and because Miriam has been receiving temporary alimony of $200 per week (less $200 per month allocated for support of the children) we are of the opinion that interest should not begin to run until the date the judgment is amended in conformity with this opinion, at which time the temporary alimony shall cease.

The final judgment in this action was entered on August 10, 1962, and it appears from the record that since that date $25,000 has been paid on the award of permanent alimony, leaving a balance of $275,000,

which shall be due and payable as follows: $50,000 on the date the judgment is amended pursuant to the mandate issued on this opinion; $25,000 on or before December 31 of each of the years 1965 to 1971, inclusive, and $50,000 on or before August 9, 1972. The obligation shall bear interest at 4% per annum, with all interest accrued on the unpaid balance being due and payable annually on December 31. Any prepayments on the principal heretofore made, other than the $25,000 we have mentioned, or which Max may elect to make in the future shall be credited to future installments on the inverse order of their due dates. In the event of any default in payment of principal or interest, or any violation of the terms of the final judgment, Miriam may without notice elect to precipitate maturity of the entire unpaid balance of the debt. All of the unpaid portion of the debt shall be protected by such security as the chancellor sees fit to require in the judgment, including injunctive relief against Max's causing, directly or indirectly, any of the capital assets held by him or by any corporation in which he has a controlling interest to be transferred without approval of the court.

The judgment will further provide that if it should be later determined that the alimony installments are "periodic payments" within the meaning of § 71 of the Internal Revenue Code, Miriam shall be entitled, on application to the court, to an adjustment in the amount of alimony sufficient to cover such income taxes as she is thereby required to pay.

We have current motions and affidavits before us in which it is suggested that Max has transferred some of his assets during the pendency of this proceeding. If that proves to be so, and if he is unable to provide adequate security, the chancellor may adjudge all or a suitable portion of the alimony award to be payable at once and the balance, if any, at such time or times as he deems wise.

 The record shows that the chancellor declined to credit the temporary alimony payments against the total award. That was within his discretion, which we do not find to have been exercised unreasonably. Hickey v. Hickey, Ky., 383 S.W. 2d 114 (1964).

We do not find the attorney fee to be excessive for the handling of this difficult and acrimonious controversy. We are of the opinion also that the allowance of $3,640 as reimbursement for expenses reasonably incurred was not, under the circumstances of the case, an abuse of discretion.

The cause is affirmed in part and reversed in part with directions that the judgment be amended in conformity with this opinion.