Clyde W. REED, Appellant,

v.

Jean Moore REED (L. M. Tipton Reed and William E. Scent, Her Attorneys), Appellees.

Court of Appeals of Kentucky.

Dec. 12, 1969.

As Modified on Denial of Rehearing June 26, 1970.

L. M. Tipton Reed, Neely & Reed, Mayfield, William E. Scent, Reed, Scent & Reed, Paducah, for appellee.

STEINFELD, Judge.

This is a contest over an alimony award, disallowance of a part of fees and litigation expense, maintenance for children and matters related to the foregoing. The husband has appealed and the wife has attempted to cross-appeal. We affirm the judgment in part, reverse it in part and sustain the motion to dismiss the cross-appeal.

Only three contentions and questions are submitted to this court. They are as follows:

"I. Jean Reed is Entitled to No More Than Maintenance and Support From Clyde Reed.

II. Jean Should Pay Her Attorneys and Expert Witnesses.

III. A Father's Obligation to Support His Child Does Not Extend Beyond the Age of Eighteen."

"STATEMENT OF QUESTIONS PRESENTED

1. Is a wife who wrongfully abandons her husband of twenty years, takes their children away from him and refuses to make them obey the orders of the Court, entitled to anything more from him than adequate maintenance and support for life or until she remarries?

2. Is such a wife with a separate estate in excess of $110,000 (all but $500 of which was acquired by reason of the marriage) entitled to require her abandoned husband to contribute $20,-000 toward her attorneys' fees, pay one-third of her expert witnesses' fees and all of the Court costs?

Raymond B. Dycus, Smithland, Clifford E. Smith, Clifford E. Smith, Jr., E. Gaines Davis, Jr., Smith, Reed, Yessin & Davis, Frankfort, for appellant.

3. Does a father have any legal obligation to support his children after they become 18 years of age?"

When Clyde and Jean were married Clyde's property was worth $50,000 and Jean's $500. The chancellor opined "From that modest beginning, through industry, foresight—and perhaps an uncanny sense of imagination and management—the net worth of the husband as of the date of submission of this case is between $4,761,-000 and $7,132,500; the lower figure being the net worth established by the husband's appraisal testimony; the higher figure being the value fixed by the wife's appraisers." Through property given to Jean by Clyde her estate then was approximately $110,000.

Their daughter, Marilyn, was born January 31, 1953, and their son, David, on August 15, 1954. Clyde devoted almost all of his waking hours to his businesses and Jean looked after the home and raised the children admirably. They lived frugally. This routine continued from the time of the marriage until some time in 1966 when Jean and the children left the home and shortly thereafter Jean sued for a divorce.

In 1964 the Internal Revenue Service asserted a claim for additional income taxes which eventually resulted in a settlement whereby Clyde and his corporations paid approximately $1,000,000. to the federal and state governments. Depressed by worry over raising the funds to meet the income tax demands Clyde secluded himself almost nightly during 1965 and 1966 from Jean and the children. He retired to a darkened room and remained there from the conclusion of the evening meal until bedtime. During that period rumors were brought to Jean that Clyde was having an "affair" with an office employee. These rumors were never substantiated with proof to Jean and the court said they were " * * completely unfounded so far as the record discloses * * *". In December 1964 Jean suffered a nervous breakdown, spent considerable time in hospitals and after

her release in March 1965 moved from their home and later sought the divorce on the ground of cruel and inhuman treatment. KRS 403.020(3) (b). Before the decree was granted Clyde tried unsuccessfully to reestablish the marriage. Clyde denied the allegations and counterclaimed on the basis that she was guilty of cruelty (KRS 403.-020(4) (d)) but later he amended and charged that she had abandoned him and that the abandonment had continued for more than one year. KRS 403.020(2) (a). There was litigation over the property, alimony, and maintenance for the children, but on Jean's claim for their custody Clyde did not resist.

The lower court adjudged that Clyde, rather than Jean, be granted the divorce on the abandonment charge but gave her the children. It awarded to Jean lump sum alimony in the amount of $500,000., credited by her present estate, giving her a net of approximately $390,000. Additionally, it ordered Clyde to pay periodic alimony at the rate of $25,000.00 per year for 10½ years but made provisions with respect to the death of either of the parties during those years. It also held that he should pay to his wife's attorneys $20,000. on account of their $60,000. fee, one-third of the cost of appraiser Waldrop whose total charge was $9,400. and the same proportion of the $1,200. charge of accountant Nale. Waldrop and Nale were engaged by Jean to assist in presenting her evidence. The court directed that Clyde pay all of the court costs of the action.

■ Although he insists that he is being required to pay far more than he should, the appellant approves the statement made by the chancellor that Jean is "* * * entitled to alimony in an amount that will be amply sufficient to provide her with financial independence for as long as she can expect to live; but she is not entitled to have this amount based on any certain percentage of the wealth that has been accumulated during this marriage." He contends that she should not have been given a lump sum award although he offer-

ed to set up a trust which would provide her an income of $1,000. per month for her remaining unmarried life. Upon her remarriage or death the children would receive the income and corpus of the trust. Also he offered to buy or build her a home and furnish it at a total cost not exceeding $35,000. He also offered to support and educate the children. Clyde notes that the uncontradicted evidence shows that for the five years immediately preceding the separation the expenses for the maintenance of the home and all other normal living expenses averaged less than $1,000. per month. He considers it significant that the court found $625. per month alimony pendente lite as reasonable and that it is paradoxical for the court to make such a generous award at the conclusion of the litigation. He attacks both the amount of the lump sum award and of the annual allowance.[1]

■ Appellant takes issue with the finding of the chancellor as to the value of his estate contending that it is worth not more than $3,782,000. He says that even if it be worth $5,000,000. there is nothing shown to justify an allowance based upon the size of the estate. We find sufficient evidence to support the conclusion of the court as to value, but even if the correct amount was $3,782,000. the amount of the allowance would be justified.

■ Appellant's counsel concede that other cases offer little guidance, but they call our attention to Chastain v. Chastain, Ky., 405 S.W.2d 758 (1966). However, there it was found, as here, that the wife was at fault but alimony was allowed to her in the absence of proof of immorality. No claim has been made of immorality on the part of Jean. They note that the experience of the wife in investing funds and taking care of financial matters was a factor properly considered in Holder v. Holder, Ky., 424

S.W.2d 600 (1968), and say that Jean has had no experience in investing money. Clyde is quite concerned that the allowance to Jean of a substantial lump sum is putting her in possession of wealth with which she is incapable of dealing. Lump sum alimony awards are favored by this court. Broida v. Broida, Ky., 388 S.W.2d 617 (1965).

■ KRS 403.060(1) authorizes an award of alimony to the wife if she has insufficient estate of her own, and she obtains a divorce. Coleman v. Coleman, 164 Ky. 709, 176 S.W. 186 (1915). "It is well established by judicial interpretation that a needy wife may receive alimony on a divorce granted to the husband where she is not entirely to blame for breaking up the marriage and is free from moral delinquency." 54 Ky.Law Journal 222. Many of our decisions are cited in support of this statement. Clyde does not rely on the denial of the divorce to the wife. We interpret that statute to mean that " * * * the wife's estate must be of such character and amount as will yield income or profits sufficient for her comfortable maintenance in a style suitable to her social standing, without her being required to consume the principal." Scott v. Scott, Ky., 433 S.W.2d 631 (1968). Clyde says that Jean was guilty of misconduct in breaking up the home and that Scott stands for the proposition that she should not profit by her misconduct. Also argument is made that Jean's $110,000. estate would produce in excess of $550. per month and that it would take only another $5,400. annually to provide her $1,000. per month, the amount on which the entire family had lived. One answer is that while the trial court found that she was at fault, which finding we do not disturb, nevertheless, it appears to us that he sacrificed his marriage to his business. The habits of Clyde in substantially ignoring his family were compelling influences on her actions. Cf. Ca-

---

1. On petition for rehearing appellant for the first time contended that the court was powerless to award Jean any alimony in excess of that which Clyde had offered. KRS 403.060. We reject it.

RCA 1.350(b). Herrick v. Wills, Ky., 333 S.W.2d 275 (1959); Stewart v. Jackson, Ky., 351 S.W.2d 53 (1961), and Com., Dept. of Highways v. Thomas, Ky., 427 S.W.2d 213 (1967).

wood v. Cawood, Ky., 329 S.W.2d 567 (1959).

Although Jean worked little in the various business ventures she ran the home at such a minimum expense, commensurate with the family income and wealth, that we cannot say she did not assist in creating that wealth. In speaking of restoration of property we said in Cooke v. Cooke, Ky., 449 S.W.2d 216 (1969), that where " * * * property has been accumulated in the course and by virtue of the joint efforts of husband and wife as a marital unit, one carrying out his responsibilities and the other carrying out hers. * * * upon dissolution of the marriage, the trial court should be free to weigh it up and determine when, whether and how it is to be cut off and separated out." Here it appears that the same reasoning should apply. The chancellor permitted Jean to retain the property valued at $110,-000. which she received by reason of the marriage although she was required to credit it on the lump sum award. The $500,000. award together with the annual installments does not appear to be an abuse of discretion, therefore, it will not be disturbed. Long v. Long, Ky., 416 S.W.2d 353 (1967); Justice v. Justice, Ky., 421 S.W.2d 868 (1967) and Lyen v. Lyen, Ky., 422 S.W.2d 127 (1967).

■ Appellant complains bitterly that "the real cost" to him of the lump sum award will greatly exceed $500,000. because he was ordered to pay the balance within 90 days of the judgment date. The proof showed that raising "immediate cash" of sufficient amount would be difficult and costly. Sales at sacrifices would be necessary and the tax impact would be huge. In Broida v. Broida, Ky., 388 S.W.2d 617 (1965), we held that the tax impact should be considered. There we fashioned a plan for payment to avoid unnecessary burden—we do so here.

The judgment should be amended to provide that one-fourth of the balance (approximately $390,000) of the lump sum award was due and payable on May 7, 1969, one-fourth of that balance on or before February 7, 1970, one-fourth on or before February 7, 1971, and the remainder of the lump sum award on or before February 7, 1972. The unpaid balance of that award shall bear interest at the rate of 4% per annum from February 7, 1969, (the judgment date), until the due date of each installment, and 6% thereafter, with the accrued interest on the remaining balance being due and payable when each installment is due.

Payment of the amount of the lump sum award should be secured by pledge, lien or other adequate protection in such manner as shall be determined by the chancellor. Default in making any payment in full when due or in providing required security shall authorize Jean to precipitate the balance and enforce immediate payment thereof.

■ Clyde attacks the judgment because it requires him to " * * * contribute a reasonable amount for the support and maintenance of (his) children until each shall attain the age of twenty-one years or until they marry or become self-supporting, ever which event should first occur." The court did not fix a specific amount. In Young v. Young, Ky., 413 S.W.2d 887 (1967), we held that in view of the enactment of KRS 2.015 fixing the age of majority at 18 the court was without right to require the husband to maintain his children after their 18th birthday unless they became physically or mentally incapable of supporting themselves. Also see Blackard v. Blackard, Ky., 426 S.W.2d 471 (1968). The portion of the judgment which specifies that support shall be provided after age 18 was erroneous.

■ The trial court found " * * * that a total gross fee of not less than $60,000. plus reimbursement of their out-of-office expenses, is reasonable and justified" as compensation for the services rendered to Jean by her attorneys and adjudged that Clyde should pay one-third of that fee and expenses. He objects and

argues that both KRS 403.060 and KRS 453.120 have been interpreted as being subject to the general limitation that the wife's separate estate be insufficient for her to defray the expense of the litigation. While KRS 453.120 does not specifically state that the husband shall defray the expense of the attorneys for the wife we have so construed it. Wills v. Wills, 168 Ky. 35, 181 S.W. 619 (1916), and Anderson v. Anderson, 310 Ky. 521, 221 S.W.2d 69 (1949). It provides: "In actions for alimony and divorce, the husband shall pay the costs of each party, unless it appears in the action that the wife is in fault and has ample estate to pay the costs." Clyde contends that Jean's estate is ample to pay her attorneys. He has made those attorneys parties to this proceeding so that this matter could be litigated. Jones v. Jones, Ky., 412 S.W.2d 868 (1967), and Smith v. Smith, Ky., 424 S.W.2d 573 (1968). Jean had no estate except that given her by Clyde, the amount of which was credited on the alimony award. It was not error to hold that the attorneys must be paid in part by Clyde. Cf. Robb v. Robb, 281 Ky. 729, 137 S.W.2d 385 (1940).

■ Clyde argues that there is no justification for a fee of $60,000. to Jean's attorneys regardless of Clyde's or Jean's ability to pay.[2] He relies upon the minimum fee schedule of the Kentucky State Bar Association and claims that a fee based upon that schedule would be reasonable. He overlooks the fact that this is a "minimum fee schedule", and serves only to advise the court. Many factors enter into a determination of the proper amount. King v. King, 218 Ky. 9, 290 S.W. 725 (1927); Stubblefield v. Stubblefield, Ky., 327 S.W.2d 24 (1959) and 27A C.J.S. Divorce § 224 c, p. 987. In the brief filed here counsel carefully analyzed the number of hours spent and the type of litigation, all of which we and the trial court con-

sidered and we are unable to say that the amount fixed was clearly or at all erroneous. Cf. Broida v. Broida, Ky., 388 S.W.2d 617 (1965) and Hopkins v. Hopkins, Ky., 431 S.W.2d 863 (1968).

Clyde objects to being charged with one-third of the compensation and expenses claimed by an appraiser and an accountant employed by the wife. It appears to us that the services of those two experts were necessary and our holding with respect to the requirement that the husband pay one-third of the attorneys' fee is equally applicable to the decision concerning the payment of the charge for those experts. Walters v. Walters, Ky., 419 S.W.2d 750 (1967) and Justice v. Justice, Ky., 421 S.W.2d 868 (1967).

We must now determine whether we may consider the contentions made by Jean on her attempted cross-appeal. She says that she is entitled to alimony approximating one-third of Clyde's estate; that it was error to require her to pay any part of her attorneys' fees or expenses for expert witnesses; and that she is entitled to a lien to secure the deferred alimony payments. She also claims that she was improperly denied certain discovery opportunities and that the court erroneously considered irrelevant factors in determining the amount of the alimony award. In connection with these arguments we are referred to many cases and texts.

■ On May 12, 1969, appellant filed a statement of appeal (RCA 1.090), paid the tax (KRS 142.011(1)), gave bond (CR 73.05) and deposited the record with the clerk. The appeal was docketed and forthwith a notice was mailed to all attorneys of record. RCA 1.070(b). Even though counsel for Jean had filed notice of cross-appeal on April 22, 1969, as provided by CR 73.02 and CR 74, they took no procedural steps to perfect the cross-appeal until September 9, 1969, when there

---

· 2. Clyde does not argue that the court is powerless to require a husband to defray part of a wife's expenses for attorneys, appraiser or accountant.

was delivered to the clerk of the Court of Appeals a statement of cross-appeal, a check for $50. as a cash bond and a motion for leave to file a tendered bond. CR 73.06(2). Two days later appellant moved to dismiss the cross-appeal on the ground that it was not perfected within the time permitted by RCA 1.080.

That rule, after its amendment which was effective May 1, 1968, provides:

"To perfect a cross-appeal, the party taking a cross-appeal shall, within 20 days after the mailing of the notice provided in RCA 1.070(b), (1) pay the tax required by KRS 142.011(1), (2) file a statement of cross-appeal setting forth (a) the name of each cross-appellant and each cross-appellee, (b) the name and address of counsel for each cross-appellant and each cross-appellee, and (c) the date the notice of cross-appeal was filed and the page of the record on appeal on which it may be found, and (3) file the bond on appeal required by CR 73.05."

Clyde cites United Mine Workers of America v. Morris, Ky., 307 S.W.2d 763 (1957), in which an appeal was dismissed for failure to file a statement of appeal. We said that "Judicial administration is dependent upon procedural rules. Without a definitive method of procedure a court cannot function effectively, nor would citizens have the equal protection of the law." We made it clear that the timely filing of the statement of appeal was " * * * not a formality, but is required because it furnishes this Court necessary information with respect to the parties to the appeal, the judgment appealed from, and other items of importance." Stating that "Such rules have the force of law", we refused to relax the rule and adjudged that the attempted appeal should be dismissed. The rationale of that ruling applies with equal force to the 20-day time limit fixed by RCA 1.080.

Appellee concedes that almost four months had passed before she made effort to perfect the cross-appeal. In the meanwhile, the appellant had moved the Court of Appeals to be permitted to practice the appeal on the original record which motion was sustained, the appellees had filed a "designation of record on cross-appeal" (CR 75.01), the appellees had filed a response to appellant's motion to practice the appeal on the original record and requested that if the court sustained the motion the cross-appellee be given the same permission. Further, the appellant moved to advance the case which motion was sustained, the appellant filed its brief and a reply brief to the appellees' brief which she had filed. The case was submitted on August 1, 1969. The court did not rule on the appellees' motion that she be permitted to practice the cross-appeal on the original record.

▬ In support of her argument that the cross-appeal should not be dismissed, Jean claims, without merit, that she was not required to comply with RCA 1.080 until the court had ruled on the motion to prosecute her cross-appeal on the original record. There is nothing in RCA 1.080 which provides for an extension of the time fixed by that rule. Furthermore, the court could not be expected to pass upon the motion until the cross-appeal had been perfected.

▬ Secondly, the appellee contends that Clyde waived his objection to appellees' late perfection of her cross-appeal. Her counsel cite Bardill v. Bird Well Surveys, Inc., Ky., 310 S.W.2d 265 (1958), in which a motion to dismiss by reason of appellant's late filing of the record on appeal was the issue. We said that "The filing of the record on appeal is not a jurisdictional matter, and non-compliance with the time limits of CR 73.08 may be excused under special circumstances." She also refers to Elam v. Acme Well Drilling Co., Ky., 411 S.W.2d 468 (1967), in which the appellant had failed to designate the record for more than 100 days after the day the notice of appeal was filed. The appellees

had failed to seasonably move for dismissal which we said was a waiver of the right to make that demand. In the case now before us counsel for Clyde moved to dismiss the appeal almost immediately after the appellees had served their motion for leave to file the cost bond which they say was their first notice that RCA 1.080 had not been complied with.

The cross-appeal must be and it is dismissed even though this may seem harsh. Gulf Oil Corporation v. Vance, Ky., 431 S.W.2d 864 (1968). The issues raised thereby, except those discussed in connection with the original appeal, will not be considered. The judgment is affirmed in part and is reversed to the extent indicated herein and the trial court is directed to correct and amend the judgment to conform to this opinion. The cross-appeal is dismissed.

All concur, except OSBORNE and NEIKIRK, JJ., who dissent.

PALMORE, Judge (concurring).

The dissenting opinion in this case contains a valuable historical analysis of the development of the current state of the law in this jurisdiction relating to the increasingly difficult problems of divorce, alimony and property division. However, the principal issue discussed in the dissent was not really presented at the trial level and was certainly not urged on this appeal.

While we appear to stand alone in our approach to statutory construction in this field, the same authority which notes this variance also admits that our decisions have generally achieved acceptable results. Despite the literalism of the particular statute, the legislature has also deliberately vested jurisdiction in matters of divorce and alimony in equity courts for a long time. That the powers of equity have always been adapted to meet social problems and changes as they arise is an established tradition which cannot be regarded as completely unknown to the legislative branch.

Nevertheless, the dissent ably illustrates a real need for a restatement of the law in this jurisdiction. In my view that restatement should consist more of clarification and recasting of language than in any radical change of governing principles.

In the instant case, the appellant has argued that he is willing to pay substantial amounts for the support of appellee—the only issue is how much. An able and conscientious trial judge carefully and meticulously undertook to effect what he conceived to be a fair and equitable result under existing law. No abuse of discretion on his part is shown in this aspect of the case.

Recognizing the need of clarification and reconciliation of apparently conflicting statements in our opinions in this delicate area, I am nevertheless convinced that in this case the trial judge acted properly within the framework of existing law. I do not believe the result would be different under the restatement of law that I am persuaded is necessary.

I am authorized to state that Judge Reed (no relation to the parties to this action) concurs in the views which I have stated.

We therefore concur in the majority opinion and in the results directed therein.

OSBORNE, Judge (dissenting).

Our present statute with regard to what a wife should receive from her husband after a divorce is KRS 403.060. It provides:

"(1) If the wife does not have sufficient estate of her own she may, on a divorce obtained by her, have such allowance out of that of her husband as the court considers equitable; but no such allowance shall divest the husband of the fee simple title to real estate.

"(2) Upon final judgment of divorce from the bonds of matrimony, each party shall be restored all the property, not disposed of at the beginning of the action that he or she obtained from or through the other before or during the marriage and in consideration of the marriage."

"(3) Pending an action for divorce or for divorce from bed and board, the court may allow the wife maintenance."

This statute is the basis for any property settlement or alimony granted after a divorce. To trace the evolution of this statute one must go back to two statutes, one enacted in 1800, the other in 1809. The 1800 statute was an act concerning alimony. It can be found in 2 Litt. 409. It provided that the court could grant a wife alimony if she proved that her husband had abandoned her for one year, lived in open adultery for six months, or had been guilty of cruel, inhuman and barbarous treatment. After such a decree, the wife could live apart from her husband and could use the alimony or any property afterwards acquired by her as if a femme sole. This statute apparently set up a statutory scheme for divorce a mensa et thoro similar to that granted by the ecclesiastical courts of England. Such decree did not end the marriage, it merely freed the wife to live apart from her husband. Since at common law the wife could have no property of her own, all property which she owned prior to the marriage became her husband's. This also applied to any property acquired after marriage. A wife apart from her husband was necessarily destitute. For these reasons, the ecclesiastical courts made provisions for the wife in this situation. Such a provision was in the form of alimony, or a periodic sum for support. Madden, Domestic Relations (1931). This apparently was what this statute was intended to provide. Subsequently, the Court of Appeals of Kentucky decided that the courts of the Commonwealth could grant alimony in such a situation without statutory authority, the jurisdiction of the English ecclesiastical courts in this regard having evolved upon the courts of equity. Butler v. Butler, 4 Litt. (14 Ky.) 201 (1823).[1]

The second of these early statutes is "An Act regulating Divorces in this Commonwealth" passed in 1809 and found at 4 Litt. 19. This provided for divorce a vinculo or divorce from the bonds of matrimony if the defendant spouse were guilty of certain conduct, although it refers to such simply as divorce. It provided that, "The court pronouncing the decree of divorce shall regulate and order the division of estate, real and personal, in such

1. There seems to be some confusion in our case law to the effect that the right to grant alimony existed under the common law. Nothing could be further from the truth. The ecclesiastical courts made such awards in granting decrees a mensa et thoro, but no such power ever existed in the chancery courts and without statutory authority never existed where divorce a vinculo matrimonii was granted.

In the Butler opinion, Judge Miles discusses this problem as follows:

"On this question, elementary writers place the power of decreeing alimony, in general terms, among the powers of the chancellor. But when the adjudged cases are examined, it is found that generally some peculiar circumstances must exist to authorize such decree. Thus, it is said, that there must be an agreement between the parties that alimony should be allowed, or a previous sentence of an ecclesiastical court, separating the parties *a mensa et thoro*, from which an agreement would be implied, or the chancellor would not interfere; that is, he would not take the matter *ab origine*, settle the separation and grant alimony. As to decreeing a separation, it seems clear that the power was never considered in England to belong to the chancellor; but to the ecclesiastical courts. And it has been the clear understanding since the commencement of our government, in every state, so far as is known to the court, that no power of granting divorces, either *a mensa et thoro*, or *a vinculo matrimonii*, existed in any tribunal until it was granted by legislative authority and that the marriage contract without such grant, could not be annulled, either in whole or in part." Butler v. Butler, 14 Ky. 201, 4 Litt. 201, p. 203.

way as to them shall seem just and right, having due regard to each party, and the children if any * * *." Such proceeding as this had no precedent in the English practice. There being no judicial divorce a vinculo in the Common Law, such divorce could only be granted by an act of Parliament. Madden, Domestic Relations (1931). After divorce a vinculo matrimonii, the parties were apparently restored to the property they had before marriage. However, it is not clear under the Common Law that any other division of property was granted. This statute did not require a complete restoration of the wife's property. See Wilmore v. Wilmore, 15 B.Mon. (54 Ky.) 49(4), wherein, in a divorce action commenced under this Act, it was argued that the wife ought to be restored certain slaves which came to the husband through her. This statute does not speak of alimony or maintenance, and no cases can be found under it granting other than a division of the property of the parties.

In 1850 the Commonwealth adopted a new Constitution. This Constitution called for the legislature to use statute revisors to consolidate the statutes in force and report back to the General Assembly. At this time substantial changes were made in the divorce laws of the state. The compiled statutes were enacted by the General Assembly in 1852. The 1852 enactment is substantially the same act which we have today. It provided for divorce from the bonds of matrimony and divorce from bed and board. Chapter six of the Act provided, "Upon final decree of divorce from the bonds of matrimony, the parties shall be restored such property, not disposed of at the commencement of the suit, as either obtained from or through the other before or during the marriage, in consideration or by reason thereof; and if the wife have not sufficient estate of her own, she may, on a divorce obtained by her, have such allowances out of that of her husband as shall be deemed equitable." This Act seems to speak only in terms of restoration of property and a property settlement and not to contemplate periodic alimony as such. In light of the Common Law history and the previous statutory history in this state, there seems to be little doubt but that this was the intent of the legislature. Alimony or periodic support had historically only been allowed to supplant the husband's obligation to support his wife during the marriage or after divorce a mensa et thoro, which did not end the marital relationship. Since this obligation to support did not exist after a divorce a vinculo matrimonii, it seems doubtful that the legislature intended to apply it here. For a considerable time after this piece of legislation was enacted our courts interpreted the alimony provision as referring only to a property settlement and did not interpret it as a grant of power to award alimony. This rule was first departed from in Canine v. Canine, Ky., 16 S.W. 367 (1891). In this case the court held that the wife could be granted support by way of periodic payments where the husband did not have an estate at the time of the divorce out of which a lump-sum payment could be made. When we consider the historic background of the legislative Act, it would appear that this case added something to the law which had not previously existed and which has been with us since.

The next case decided by this court with great historical significance as far as alimony is concerned was Davis v. Davis, 86 Ky. 32, 4 S.W. 822 (1887). Even though the Act provided that the wife was entitled to alimony only upon divorce being granted to her, the court held that where the chancellor obviously abused his discretion and wrongfully granted the divorce to the husband this could not work to bar the wife from alimony even though this court had no power to reverse the divorce decree.

The next case to come before the court of historical significance was Tilton v. Tilton, 29 S.W. 290 (1895). Here the court held that where the wife is granted

the divorce, alimony should follow as a matter of right, saying, "We understand the rule to be that, in an action for divorce, the right to alimony will follow, if the wife is granted the divorce." Here the court completely overlooked the fact that the right of the wife under the Act is conditioned on her lack of sufficient estate of her own.

As a result of the above three cases, it would seem that the court substantially amended the legislative Act by first adding periodic payments in lieu of a lump-sum settlement. Second, by authorizing alimony where the divorce had been granted to the husband if the chancellor was clearly erroneous in this action. Third, by authorizing alimony where the wife is granted the divorce even though she might have sufficient estate of her own. It is submitted that up to this point in our history no great damage had been done to the Act itself. Even though one would have to admit that the Davis case constituted a substantial amendment to the Act, it seems to be one that was necessary in order to prevent a manifest injustice in view of the fact that this court cannot reverse a trial court in the granting of a divorce decree.

The Canine case constituted an extension of the law if one gives strict construction to the Act, however, it can be allowed that the Act did encompass alimony, if one views the husband's estate as including his earning power. Granted this is a result never before reached by our courts it nevertheless is not totally unreasonable.

Following the above cases, the court in a long series of decisions wherein alimony and property rights were before it seems to have been confused as to the exact nature of the award being made. The court would approve an award of a certain sum of money, and attempt to justify its action by talking in terms of the wife's dower interest or of her future need for living expenses or of the contributions which she had made toward the accumulation of her husband's estate either in the form of labor or money.

Because of confusion as to the nature of the award being made and by extending the rules originated in the Tilton, Davis and Canine cases, the court became more lax in its awards of alimony and paid less and less attention to the provisions of the Act itself. All of this culminated in 1961 in Heustis v. Heustis, Ky., 346 S.W.2d 778. Here the husband was granted a divorce and apparently properly so, which under the Act would have barred the wife from alimony unless this court under Davis could say that the trial court abused its discretion in awarding the husband the divorce. The wife had made no contribution to the husband's estate either through work or funds which would entitle her to an equitable distribution out of it. Yet, this court awarded alimony equal to one-third of the husband's estate. In the course of the opinion, we said:

"That a wife who makes the home, raises the children, gives succor and moral support to the husband and aids him in the saving and investment of his money, but who does not directly convert any individual effort or earnings into the form of property, in the event of divorce has no interest in the property accumulated through the husband's earnings during the marriage is a travesty made tolerable only by the judicial power to correct it in the form of alimony.

" * * * Where the wife has fully performed her share of the responsibilities during the substantial portion of her married life with the husband and has not brought on the divorce by moral delinquency, and the husband is not entirely free of fault, we are of the opinion that alimony should be in an amount not less than one-third of the estate accumulated from the income of the husband during the marriage (as distinct from whatever portion of his estate may have been derived from independent sources), unless, of course, she has a sufficient estate of her own or unless there are other unusual circumstances rendering such a division inequitable."

The Heustis case is so completely in conflict with the statute as to make the two irreconcilable.[2]

At this point it might be well to clear up some terminology which is often loosely used by the court. There is a clear and distinct difference between an award of alimony to a wife and the award of an equitable settlement out of the husband's estate due her as a result of contributions she has made to the accumulation of the estate either through the contribution of work or personal funds. For these distinctions see 24 Am.Jur.2d, § 525, Alimony distinguished from dower or from wife's equity, p. 650–1.

"The function of alimony is merely to make provision for the support of the wife during the lifetime of the husband. After his death there is no longer any necessity for its allowance at common law for, as the ecclesiastical courts did not grant an absolute divorce for causes that supervened the marriage, but only one a mensa et thoro, the marriage relation was still preserved and as the widow she then came into the enjoyment of her dower rights. * * * "Since alimony is based upon the duty of the husband to support his wife, the funds wherewith it is to be paid must proceed from his own estate; and if he has nothing and is unable to obtain anything wherewith it may be paid, it must remain unpaid.

* * * "There is another type of 'wife's equity,' which is based on her contributions during marriage to the husband's acquisition of property, a recognition of which is in the nature of a settlement of property rights."

See also 24 Am.Jur.2d § 928, p. 1057, Type of Property, or time and manner of acquisition:

"One spouse may have a special equitable interest in property held in the other's name, which interest may arise in many ways, and the court may award a share of the property representing such special interest in it. For instance, it is held that where a wife by her own industry and labor has contributed to the husband's acquisition of an estate, she has an equitable interest which must be recognized by a division of property. And where the wife has contributed money toward the purchase or improvement of the family home she has an equitable interest in the property measured by the amount she has spent, especially where the parties have treated her contribution as a loan to be repaid by the husband."

The Heustis case cannot be justified as an equitable distribution of the husband's estate under any known rules of law. The award had to be one for alimony and in view of the fact that our statute requires that the divorce be granted to the wife before she is entitled to alimony, it seems impossible that this result could be reached when the husband was awarded the divorce. Many different jurisdictions have in their alimony statutes the same requirements as ours requiring that before the wife is entitled to alimony she must be awarded the divorce. We alone of all jurisdictions have failed to give effect to this requirement. As a result, we have been subjected to some rather harsh observations by the compilers of the American Law Reports Annotated. See 35 A.L.R.2d 318 wherein the general rule for all other jurisdictions is set out and then a special section added for the holdings of the Kentucky Court of Appeals:

"In Kentucky there are nearly one hundred reported cases on the present sub-

2. For a blow-by-blow account of what happened between Davis and Heustis see the following cases: Lacey v. Lacey, 95 Ky. 110, 23 S.W. 673 (1893); Tilton v. Tilton, Ky., 29 S.W. 290 (1895); Pore v. Pore, Ky., 50 S.W. 681, 20 Ky.Law Rep. 1980 (1899); Green v. Green, 152 Ky. 486, 153 S.W. 775 (1913); Moore v. Moore, 231 Ky. 829, 22 S.W.2d 251 (1929); Baker v. Baker, 271 Ky. 735, 113 S.W.2d 16 (1938); Hayes v. Hayes, 275 Ky. 273, 121 S.W.2d 698 (1938); Luke v. Luke, 276 Ky. 683, 125 S.W.2d 251 (1939); Sharp v. Sharp, 302 Ky. 426, 194 S.W.2d 835 (1946); Coleman v. Coleman, Ky., 269 S.W.2d 730 (1954).

ject, and the alimony statute provides that if the wife does not have a sufficient estate of her own, she may, on a divorce obtained by her, have such allowance out of that of her husband as shall be deemed equitable. *Clearly this statute is such as to deprive the courts of the power to award alimony to a wife against whom a divorce is granted* if the statute is construed in accord with the prevailing view in other jurisdictions; and in partial accord with that view it is variously held or stated that where the husband is properly granted a divorce because of the wife's misconduct or fault she is not entitled to permanent alimony, or that she will not be allowed alimony, that the trial court properly denied or should have denied alimony, or that where the wife's treatment of the husband was so cruel as to entitle him to a divorce it prevented her from securing alimony." (Emphasis added).

34 A.L.R.2d 324, p. 324:

"In Kentucky there is a remarkable series of nearly one hundred decisions which ordinarily achieve a just result, but leave one in doubt as to the basis of the holdings. In only a few cases does the court attempt to construe a statute or find a nonstatutory solution to the problem; and the court often discusses the equitableness of a particular determination on the assumption that the statutes permit or do not prevent it from reaching an equitable result. The statute in effect when most of the cases herein were decided provided that if a wife does not have a sufficient estate of her own, she may, on a divorce obtained by her, have such allowance out of that of her husband as shall be deemed equitable. *Clearly this statute is such as to deprive the court of the power to award alimony to a wife against whom a divorce is granted if it is construed in accord with the holdings* in other states which have similar provisions." (Emphasis added).

Such comments as the foregoing are somewhat embarrassing to those of us who would see the law enforced as it is written rather than to try cases on a case to case basis and pervert the law to satisfy our own peculiar sense of justice. To demonstrate how far we have actually come from the statutory authority I would point out some of the language used by this court in Carter v. Carter, Ky., 382 S.W.2d 400 (1964), wherein we said:

"From a strictly literal standpoint KRS 403.060 confers a right to alimony only when the wife obtains (or, of course, is entitled to) the divorce. However, divorce proceedings are equitable actions in this state (KRS 403.010), and equity is broader than the statute. Hence it is well settled that even when the husband is solely entitled to and obtains a divorce the wife may and in some cases should be awarded alimony."

This statement of the law is so obviously wrong as to be shocking, for the very simple reason that there is no Common Law right to divorce whether equitable or otherwise. The right to grant a divorce is one that has always been and is legislative. Without KRS 403.010 there would be no right of divorce in this jurisdiction today, and this court would have no power whatsoever in the field. As the total power to permit divorce is in the legislative arm of the government it can grant or withhold it at will and, if it grants it, it can grant it with such restrictions as it sees fit. A fine example of how we are prone to misinterpret cases and to pervert the law to suit our own whim and caprice can be found between the cases of Carter v. Carter, supra, and Coleman v. Coleman, Ky., 269 S.W.2d 730 (1954). The Carter opinion wherein we boldly state that our power is much greater than that of the legislature cites the Coleman case for authority. Yet in the Coleman case we said:

"But this whole subject is governed by statute and it is the duty of the courts to follow the legislative enactment."

I submit that the Coleman case is no authority at all for the expressions made in

the Carter case. To further point out how inconsistent we have been, compare the language of the Heustis case with the following language from Hicks v. Hicks, 290 S.W.2d 483 (Ky.1956):

> "The Chancellor in determining the amount and manner of the alimony to be paid is *guided by no formula* but, in his discretion, should consider the following elements with respect to each party: size of estate, income, earning capacity, age, ability to labor, health, and station in life. The *cause of the divorce* and the *relative responsibility of the parties,* as well as *whether or not the wife has assisted in the accumulation* of the property concerned, should also be considered along with any other pertinent matter."

To further point up the confusion and inconsistency just five months before the Heustis case was decided in Goetz v. Goetz, 341 S.W.2d 249 (Ky.1960), this court said:

> "It is apparent from our cases that the *comparative fault* of the parties is one of the *major* considerations in determining the right to and the amount of alimony. See Scalf v. Scalf, Ky., 312 S.W.2d 467." (Emphasis added).

Many other glaring inconsistencies can be found in our cases. To point them all out would extend this dissent beyond any bearable length. The law of this jurisdiction relative to the rights of a wife to alimony is what the legislature has enacted. Nothing more, nothing less. The fact of the matter is that within the framework of judicial discretion this court constitutionally has the power to interpret that law in order to make it serve its intended function. This court has no right, it has never had a right, to change or alter so much as one period or one comma in the legislative act. It is a weakness of our system of government that erroneous judicial decisions are enforced once they become final the same as proper ones and even though the Act says in unambiguous terms that a wife is not entitled to alimony unless she is granted the divorce, we are nevertheless free to make

alimony awards when the divorce is granted to the husband and these will be enforced. However, they are not the law; they will never be the law and a thousand years from now they will prove nothing but the fact that a court in this day and age had a right to ignore the plain, simple law and decide cases out of its bounds. As far as I know it has never been questioned and will never be questioned but what the right to grant divorce is a power of the state. It can bestow it or it can withhold it. In England this was done through Parliament and not until the statute of 20 and 21 Vict. (1857, chapter 55), entitled "An Act to Amend the Law Relating to Divorce and Matrimony Causes in England," were the courts of England given any jurisdiction at all in the field. 2 Burn.Eccl.Law 202; Macq.Parl.Pr. 470. In the early history of this Commonwealth prior to our first divorce act in 1800, divorces were granted on an individual basis by the legislature. This being true, the legislature could put such restrictions upon the subject as it saw fit. Having enacted KRS 403.-060, we are bound by its terms and have no right to depart therefrom. The fact that this Act has been subjected to long judicial abuse does not make it any less the law. Russman v. Luckett, Ky., 391 S.W.2d 694. It is the law and it will remain the law upon this subject until the legislature changes it. Ten thousand judicial opinions saying otherwise will not make it less so. Courts can't change the law with erroneous opinions. The law will always be there. And the judicial opinions will only serve as a monument to the failure of the court system. They will never become a tombstone to a dead law.

I believe this court has no choice but to uphold this statute as it is written, with this addition that where a trial court clearly abuses its discretion in awarding the divorce to the husband and such can be found from the record, without doubt, we should consent to an award of alimony under the Davis case, supra, for I feel that case represents a proper exercise of judicial author-

ity. We should continue making an equitable distribution to the wife where she is entitled to it because of labor or funds contributed to the husband's estate, because it does not appear this in any way conflicts with the statute. We should likewise follow the Canine opinion, supra, to the extent of allowing the wife alimony out of the husband's future earnings where he has no estate of his own out of which a lump sum might be paid in instances where she has been awarded the divorce and is clearly entitled to such alimony. I believe this rule to have doubtful historical validity but I cannot say positively that the court was wrong in its adoption. In my opinion, it is now a part of our law. The decision of when a wife has sufficient estate of her own is one that will have to be made by the Chancellor on a case to case basis. Therefore, it is not possible to set down an exact rule that will work in all future cases. Unless a wife is entitled to alimony under the foregoing rules, we should deny it. This may run afoul of some people's idea of instant justice. This cannot be helped. If the people who must live under this law are not satisfied with it, their duly elected representatives will surely change it. And, when that change comes, we should move to enforce the changes just as faithfully as we enforce this Act.

In the case before us, the husband was granted the divorce because of abandonment by the wife. There seems to be no question but what this finding of the Chancellor was correct, therefore, she is not entitled to alimony. However, the husband has agreed to pay alimony in a stipulated amount. This should be approved.

Judges live and write for the moment; the law goes on forever. Judges can and do nurture, guide and enforce the law. Within the framework of construction a judge legitimately can, and oftentimes must, make a choice between two competing rules as they apply to a given set of facts. But, just as we have no right to take a blue pencil to the compiled acts of the legislature and strike therefrom those acts which do not suit our fancy, we cannot by the course of our opinions refuse to give effect to perfectly valid enactments. This is the equivalent of a veto power over legislation, which we do not have.

For the foregoing reasons, I dissent.

NEIKIRK, J., joins in this dissent.