Paul MANDELSTAM, Appellant,

v.

Marilyn H. MANDELSTAM, Appellee.

Court of Appeals of Kentucky.

June 26, 1970.

As Modified Oct. 28, 1970.

Natalie S. Wilson, and Samuel Milner, Eblen, Howard & Milner, Lexington, for appellant.

Frank Gilliam, and Anthea Mary Boarman, Gilliam, Bush & Boarman, Robert A. Sedler, Lexington, for appellee.

CULLEN, Commissioner.

In divorce proceedings between Marilyn H. Mandelstam and Paul Mandelstam the primary issue concerned the custody of their six-year-old daughter, Deborah. The chancellor found that it would be in the child's best interests for neither parent to have custody and that custody be placed in a third party. Accordingly, in the judgment in the action (which granted the divorce to the wife), the custody of Deborah was awarded to the rabbi of a local Jewish temple and his wife, who had children with whom Deborah was friendly and who were well acquainted with the Mandelstams (who are of Jewish faith). Paul and Marilyn each was given the right of separate day-time visitation once a week, and the right to have the child for a two-week period in the summer. The rabbi and his wife were made parties to the action and the award of custody was made subject to further control by the court.

Paul has appealed, maintaining that the trial court correctly denied custody to Marilyn, but erred in denying custody to him. Marilyn's position on Paul's appeal is that the judgment is correct to the extent that it awards custody to Rabbi and Mrs. Leffler instead of to Paul, but she has cross-appealed, asserting that the judgment is in error in not awarding custody to her.

We shall first dispose of Marilyn's cross-appeal.

 "The chancellor found that Marilyn has a severe mental condition in that she suffers from an obsessive, compulsive, neurotic disorder, by reason of which it would not be in the best interests of Deborah for her to remain with her mother. We find ample evidence in the record to support the findings. So we are affirming the judgment on the cross-appeal."

On the direct appeal, Paul's contentions are (1) the chancellor's findings of fact are insufficient because they do not include the requisite specific finding that Paul is *unfit* to such an extent as to justify awarding custody of his child to strangers; and (2) even if the findings were considered by implication to include the requisite finding of unfitness, the evidence will not support such finding.

The findings of fact included the ultimate finding that it would be "in the best interest of the child to place her custody in a third party," and made several findings concerning the father's character, conduct and qualities, but did not find in so many words that the father was "unfit" to have custody. Paul argues strongly that such a finding is essential, relying particularly on Reynardus v. Garcia, Ky., 437 S. W.2d 740. In considering this argument we are led into the field of semantics. In the vocabulary of child custody cases the most often used terms are "unfit," "unsuitable," "unqualified," "best interests," and "welfare." We conceive that in their application to a case involving the taking of custody from a natural parent and awarding it to a stranger they all lead to the expression of the same basic concept. The concept is that if the natural parent is not capable of providing for the child minimum acceptable standards of care[1] he is to

---

1. The height of the standard may vary according to varying levels of society.

be deemed "unfit," "unsuitable" or "unqualified," and his having custody will be deemed to be not in the "best interests" of the child or for the child's "welfare."[2] We think the problem in this case arises from the use of the term "best interests," which is suggested of denoting the superlative of "good interests" and thus may be interpreted as indicating that what is called the child's "best" interest is simply something a little better than some lesser but perfectly good and acceptable interest. We believe, however, that in child custody cases the term "best interests" has acquired a special meaning; and when used in cases involving the taking of custody from a natural parent and giving it to someone else it means the opposite of being *detrimental* or *harmful* to the child's interests rather than indicating the top among several perfectly acceptable choices.

■ It is our opinion, therefore, that when the chancellor found in the instant case that it would be in the "best interests" of the child for neither parent to have custody, the finding was in substance and effect that neither parent was "fit" or "suitable" for the custody, such that it would be *detrimental* to the child for either parent to have custody. That such was the intent of the finding is evident from the context as a whole and particularly from a specific finding that if the child were placed in the custody of either parent she would be compelled to live in a "weird, abnormal, bizarre atmosphere."

We do not interpret *Reynardus* as holding that the finding of a parent's unfitness must use the specific word "unfit." While certainly that would be preferable, we see no reason why the finding cannot be expressed by use of other terms. (Actually, the situation found by this court to exist in *Reynardus* was that the *evidence* would not support a finding of unfitness.)

■ This brings us to the question of whether the evidence supports the finding

of Paul's unfitness to have the custody of his child. The answer must be found in a consideration of the sum total of the circumstances. Paul is a 42-year-old doctor of internal medicine serving on the faculty of the University of Kentucky Medical School. He is dedicated to his profession and frequently works nights in the laboratory. His plan, if custody of Deborah were awarded to him, was to hire a maid or housekeeper to take care of Deborah during the day, and at nights, when he worked in the laboratory, to take the child with him. Under this plan there would be little in the way of *family* life or home relationship between father and child. Paul had acquired no experience in the physical aspects of caring for a young child. Deborah had gone through an extended period of exposure to emotional conflict, such as to indicate the need for her to live in a normal family environment.

It is our opinion that the evidence as a whole warrants the finding that in the custody of her father Deborah's welfare would not be served to an acceptable minimum standard.

The judgment is affirmed.

EDWARD P. HILL, Jr., C. J., and MILLIKEN, NEIKIRK, PALMORE and STEINFELD, JJ., concur.

REED, J., not sitting.

OSBORNE, J., dissenting.

OSBORNE, Judge (dissenting).

I must respectfully dissent from the majority opinion in this case as I strongly feel it does a great injustice to the litigant, Dr. Paul Mandelstam, and distorts the law of this jurisdiction relative to the right of a parent to have custody of an infant child.

The facts of the case are accurately stated in the majority opinion, therefore, I will make no restatement of the facts.

2. Cf. James v. James, Ky., 457 S.W.2d 261 (this day decided).

The chancellor made no finding that the father was unfit to have custody of the child. The evidence would not support such finding had it been made by the chancellor. The truth of the matter is that there is not one iota of evidence in this record that in any way proves Dr. Mandelstam unfit to have custody of his infant daughter. Yet, the daughter is taken from him.

Action of this kind by a court frightens me for the simple reason that it is an exercise of arbitrary, unbridled power. It is men acting upon whim and caprice without the restraint normally imposed by law to the great injury and detriment of the innocent litigant. There is an increasing tendency upon the part of this court to follow its whims in child custody cases by parroting the trite old phrase, "the welfare of the child is controlling. The court will do that which is in the best interest of the child." These are nothing more than subjective tests and what is one man's best interest may be another man's worst interest. The continued utilization in child custody cases of this meaningless subjective test in reality is nothing more than the court following its whim without the guide of law.

There is law to control the court in this situation. The fact of the matter is the court just does not wish to be controlled. The same situation prevails here as prevailed in Reed v. Reed, Ky., 457 S.W.2d 4, rendered December 12, 1969. KRS 405.020 gives to the parent the prima facie absolute right to the custody of his child as against the whole world and the parent cannot be denied this custody until there is a judicial determination upon proper evidence that he is unfit to exercise it. We have ignored this statute. In fact, the majority opinion nowhere mentions it. It has been held as late as 1959 that the statute was applicable in this identical situation. See Goff v. Goff, Ky., 323 S.W.2d 209, wherein we stated:

"Our consideration must be confined to the record that is presented to us, and upon it we can reach no conclusion other than that Kathryn is an unfit person to have custody of the children, and that the court erred in not transferring custody to Kermit. There is no evidence to show that Kermit is not a *suitable* person to have custody of the children, *and since as a parent he has a prima facie statutory right to custody, under KRS 405.020, he does not have the burden of proving his suitability.*" (Emphasis ours).

We have consistently insisted that a child could not be taken unless there was a finding that the parent was unfit for custody. In Hatfield v. Derossett, Ky., 325 S.W.2d 84, we said:

"Inasmuch as the record before us is devoid of findings of the ultimate facts which are determinative of the only issue in the case, i. e., custody of the children, we are vacating the judgment and remanding the case to the circuit court * * *"

We have reviewed and reaffirmed all of the foregoing law as late as March of 1968. See Reynardus v. Garcia, Ky., 437 S.W.2d 740.

For the foregoing reasons, I respectfully dissent.